# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ASHISH CHORDIA, LAMPROS KALAMPOUKAS, RAGHU KODIGE, RAVI SARMA, RICHARD ANDRADES, ASHISH BALDUA, JOHN GEE, KAJAL VIBHAKAR, THE SHAOIE CHAN CHORDIA GST TRUST, THE SAMAY KODIGE GST TRUST, and THE VEVAAN KODIGE GST TRUST, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0382-NAC |
| EDWARD LEE, MATTHEW DURGIN, JAEWOO HWANG, RONALD WASINGER, ADAM SEXTON, CHRIS JO, and ZENITH ELECTRONICS LLC, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ALPHONSO INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 5, 2023
Date Decided: January 4, 2024

Bradley R. Aronstam, R. Garrett Rice, Holly E. Newell, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Brian M. Burnovski, Andrew Ditchfield, Pascale Bibi, Nikolaus J. Williams, Marie Killmond, Danielle Mullery, DAVIS POLK & WARDWELL LLP, New York, New York; *Counsel for Plaintiffs Ashish Chordia, Lampros Kalampoukas, Raghu Kodige, Ravi Sarma, Richard Andrades, Ashish Baldua, John Gee, Kajal Vibhakar, The Shaoie Chan Chordia GST Trust, The Samay Kodige GST Trust, and The Vevaan Kodige GST Trust.*

William M. Lafferty, Ryan D. Stottmann, Lauren K. Neal, Alec Hoeschel, Grant E. Michl, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, Delaware; Hallie B. Levin, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York; Timothy Perla, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts; *Counsel for Defendants Edward Lee, Mathew Durgin, Jaewoo Hwang, Ronald Wasinger, Adam Sexton, and Chris Jo.*

William M. Lafferty, Ryan D. Stottmann, Lauren K. Neal, Alec Hoeschel, Grant E. Michl, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, Delaware; William Savitt, Jonathan M. Moses, Elaine Golin, Graham W. Meli, Ryan A. McLeod, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; Eric Seiler, Lance J. Gotko, Jason Rubinstein, David J. Ranzenhofer, Sofie Syed, FRIEDMAN KAPLAN SEILER, ADELMAN & ROBBINS LLP, New York, New York; *Counsel for Defendant Zenith Electronics LLC.*

Kurt M. Heyman, Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Nominal Defendant Alphonso Inc.*

**COOK, V.C.**

Silicon Valley tech startup founders sold a majority interest in their company to LG Electronics. In exchange, the founders received cash and liquidity rights embodied in a stockholders' agreement. The liquidity rights were protected by the founders' contractual right to designate up to three of the company's seven-person board of directors. But the parties conditioned the designation right on at least one founder remaining at the company as an officer or employee (the "Designation Condition").

The stockholders' agreement also granted the LG-controlled board the right to hire and fire the company's executive officers. But this right did not allow the board to terminate non-executive-officer employees. Only the company could terminate the latter. Unlike the board, the stockholders' agreement obligated the company to use its "reasonable efforts" to ensure that the rights conferred in the stockholders' agreement remained effective for the founders' benefit.

After the sale, LG sought to remove the founders' designation right by terminating them to cause the non-occurrence of the Designation Condition. The LG-controlled board effectuated this plan by terminating the executive-officer founders. But the board could not terminate all the founders since two were non-executive-officer employees. Thus, the board appointed an interim CEO to carry out the remaining terminations. LG then executed the requisite consent to remove the founders from the board. The plaintiffs bring this action under 8 *Del. C.* § 225 seeking a determination of the board's proper composition.

I conclude that the interim CEO acted for the company in carrying out the terminations. He was thus bound by and breached the "reasonable efforts" clause in the stockholders' agreement. The company's acts, as a party to the stockholders' agreement

1

and having materially contributed to the non-occurrence of the Designation Condition, render the condition excused. Accordingly, the non-executive-officer employee founders are entitled to designate directors under the terms of the stockholders' agreement.

## FACTUAL BACKGROUND

The evidence presented at trial supports the following findings of fact.[1]

### A. The Parties And Relevant Non-Parties

In 2012, plaintiff Ashish Chordia co-founded nominal defendant Alphonso Inc. ("Alphonso"),[2] a Delaware corporation, along with plaintiffs Lampros Kalampoukas, Raghu Kodige, Ravi Sarma, and Richard Andrades (collectively, the "Founders").[3] The Founders, together with Ashish Baldua, The Shaoie Chan Chordia GST Trust, The Samay Kodige GST Trust, The Vevaan Kodige GST Trust, and non-party Sandeep Beotra, are referred to as the "Key Holders" (collectively, with John Gee and Kajal Vibhakar, and excluding Beotra, "Plaintiffs").

Alphonso is a Silicon Valley tech startup that developed automatic content recognition ("ACR") technology. ACR enhances advertising efforts by collecting data on

---

[1] Joint trial exhibits are cited as "JX___" and trial testimony is cited as "TT ___ (Name)."

[2] *See* TT 60:10–24 (Chordia).

[3] *Chordia v. Lee*, C.A. No. 2023-0382-NAC, Docket ("Dkt.") 170, Pre-Trial Stipulation and [Proposed] Order ("Pre-Trial Stipulation") ¶ 3; *see also* TT 7:1–6 (Chordia).

what smart TV users view in order to efficiently target advertisements.[4] In the years that followed its formation, Alphonso received roughly $6.2 million in funding from investors.[5] It used these funds, in conjunction with stock options, to expand its workforce to over 130 employees.[6] Between 2017 and 2019, a trend emerged of smart TV brands entering into large acquisitions or strategic partnership deals with companies like Alphonso. Although Alphonso participated in several discussions with potential smart TV brands, it remained unsuccessful in closing any such deal of its own.[7]

Defendant Zenith Electronics LLC ("Zenith") is a Delaware limited liability company and a wholly owned subsidiary of non-party LG Electronics U.S.A. Inc. ("LG US").[8] In turn, LG US is a wholly owned subsidiary of non-party LG Electronics, Inc. ("LGE"), which is based in Seoul, South Korea.[9] Among other things, LGE is a global manufacturer of smart TVs. Like the many other smart TV brands at the time, LGE also became interested in making a strategic investment in an ACR technology company.[10]

---

[4] JX0653 62:13–63:7 (Chordia); TT 494:2–20 (Edward Lee).

[5] TT 10:21–11:1 (Chordia).

[6] JX0407 at 13; *see also* TT 212:22–213:10, 247:3–12 (Kodige).

[7] TT 71:15–72:17 (Chordia).

[8] Pre-Trial Stipulation ¶ 13.

[9] *Id.*; *see also* TT 593:13–22 (Wasinger).

[10] TT 494:2–20 (Edward Lee).

Defendants Ronald Wasinger, Edward Lee, Mathew Durgin, and Jaewoo Hwang were members of Alphonso's board (the "Board") on December 16, 2022.[11] These Board members approved a resolution to terminate certain executive officers.[12] After the Board terminated the executives, it appointed defendant Adam Sexton as Alphonso's Interim CEO to carry out additional terminations.[13] Defendant Chris Jo served on Alphonso's Board from March 2022 until June 2022 and "[c]hampion[ed]" the purported reorganization.[14]

## B. The Deal

In January 2020, Alphonso began discussions with LGE over the prospect of a deal between the two.[15] The almost year-long negotiation process culminated in LGE acquiring a majority stake in Alphonso through Zenith. CEO Chordia, Chief Product Officer Kodige, CFO Beotra, and General Counsel Tom Cushing negotiated on behalf of Alphonso and the Key Holders.[16] Tom Hahm served as LGE's principal negotiator.[17]

---

[11] Pre-Trial Stipulation ¶¶ 14–17.

[12] *See* JX0515 (recording of Alphonso's Board meeting on December 16, 2022).

[13] JX0518 at 2; *see also* JX0515.

[14] *See* Pre-Trial Stipulation ¶ 18; JX0435 at 18; TT 685:24–687:20 (Jo).

[15] TT 494:21–495:4 (Edward Lee).

[16] TT 12:18–13:15 (Chordia); *see also* TT 202:19–203:1 (Kodige).

[17] *See* TT 13:9–15 (Chordia).

## 1. Negotiations

In March 2020, LGE sent Alphonso a letter of intent.[18] The letter communicated LGE's "desire" to "take a 51% equity position in" Alphonso.[19] In exchange, LGE "will work together with [the equity holders] to come up with a scheme that makes sense for all parties" and provide the equity holders with a "trigger-based method to allow for a slow exit."[20] Throughout the negotiations, LGE maintained its interest in acquiring control over Alphonso. And this issue took center stage during subsequent communications. For example, in May 2020, Chordia, Kodige, and Beotra visited LGE in Seoul to meet with Hahm, Edward Lee, and Hyoung-Saeyi Park.[21] During that visit, Beotra "insiste[d]" that the Key Holders would not sell more than 49% of Alphonso.[22] But this approach proved unsuccessful and led to the Alphonso team leaving "empty-handed."[23] Although talks eventually picked back up, LGE's message was clear. LGE was only interested in a majority stake.[24]

---

[18] JX0008 at 2.

[19] *Id.*

[20] *Id.*

[21] TT 15:12–18 (Chordia).

[22] TT 15:18–16:1 (Chordia).

[23] TT 15:18–16:1 (Chordia).

[24] TT 16:1–10 (Chordia).

The Key Holders' hesitance to give up control was justified, as they understood the gravity of the decision they were making.[25] Indeed, LGE made no attempts to hide the ball on this issue. LGE specifically stated that in these types of transactions, things "might not work out well for the founders."[26] But this was not news to the Key Holders. In one of the Key Holders' June 2020 term sheet markups, they stated that their plans for business development, external funding, and "IPO and M&A decisions will rest with LG."[27] The markup also acknowledged that "[s]omething that makes sense for Alphonso may not make sense for LG but we won't have the right to decide."[28]

As with any negotiation, the parties proposed and rejected numerous terms. Among those LGE rejected lies a June 2020 term for employment contracts.[29] If accepted, this term contemplated providing "Key Employees" with three-year employment contracts.[30]

---

[25] *See* JX0014 at 4; JX0022 at 1; JX0023 at 1; TT 15:1–4 (Chordia).

[26] TT 84:13–21 (Chordia).

[27] JX0014 at 4; *see also* JX0022 at 1; TT 75:14–79:18 (Chordia).

[28] JX0014 at 4–5; *see also* JX0022 at 1.

[29] *Compare* JX0012 at 2, *and* JX0014 at 6–7, *with* JX0050.

[30] TT 98:2–99:13 (Chordia); *see also* JX0014 at 6–7; JX0012 at 2 ("Key Employees (TBD list): [] Agree to **3-year** employment contracts, inclusive of base salary and incentive compensation [] If Key Employee leaves without Cause or Good Reason (each to be further defined), they will continue to own existing illiquid stock, but will no longer be able to participate in Employee Liquidity Option; unvested equity to be canceled. [] If Key Employee is terminated without Cause or Good Reason, their equity stake will be cashed out pursuant to the equity valuation at the time of termination (see Employee Liquidity Option for details on valuation); all unvested equity of such Key Employee to be fully accelerated[.]").

Likewise, LGE also rejected an October 2020 term that would have made "hiring, termination, or change of the compensation of the chief executive officer" subject to the veto of certain Key Holders sitting on Alphonso's Board.[31]

In the weeks following LGE's rejection of this latter term, Beotra exchanged emails with Hahm. These emails expressed concern over LGE's ability to terminate Alphonso's CEO. In one of these emails, Beotra explained his understanding that LGE would have the ability to "control[] the board and hence all the decisions that need simple board majority - CEO hire/fire/comp, operating plan, LG funding, additional debt etc."[32] In response to these concerns, Hahm did not deny LGE's ability to terminate the CEO. But he explained that firing "C-level officers and replac[ing] them with LGE staff . . . is *only a nuclear option* that we have no incentive to do, unless you are running the company into the ground and destroying value, which you also have no incentive to do."[33]

The Key Holders' hesitance to sell control was valid. Yet, giving up control came with considerable upside. The Key Holders leveraged the significance of this control to negotiate over a control premium and to bargain for favorable terms and protections.[34]

---

[31] *Compare* JX0020 at 41, *and* JX0021 at 99, *with* JX0050 § 10.5(d).

[32] JX0022 at 1; JX0023 at 2.

[33] JX0023 at 4 (emphasis added).

[34] *See* TT 98:2–99:13 (Chordia); JX0014 at 3 (June 2020 term sheet from Beotra to LGE stating that "there is a critical difference between whether LGE acquires <=49.9% or >=50.1% - it is the issue of control and hence controlling Alphonso's destiny which entails a control premium").

7

Notwithstanding the protections LGE rejected, LGE and Alphonso agreed on a variety of terms designed to afford certain rights to certain of Alphonso's stockholders (*i.e.*, the Key Holders).[35] The Key Holders, Zenith, and Alphonso gave effect to these terms by executing a stockholders' agreement (the "Stockholders' Agreement") on December 23, 2020.[36]

### 2. The Stockholders' Agreement

The protections and rights bargained for in the Stockholders' Agreement included certain liquidity rights (the "Liquidity Rights"), a director-designation right (the "Director-Designation Right"), and corresponding veto rights (the "Veto Rights").[37]

The Liquidity Rights provide Key Holders the right to demand an IPO and the right to scheduled tender offers. Section 9.1(a) sets forth the IPO demand right, which provides that if, after December 30, 2023, Alphonso receives a request from Key Holders owning fifty percent of the registerable securities held by the Key Holders in aggregate, then Alphonso shall file a Form S-1 registration statement.

---

[35] *See* JX0050.

[36] *Id.*

[37] *Id.*

Section 11.1 sets forth the scheduled tender offer right.[38] This right provides that Zenith shall commence scheduled tender offers at the greater of fair market value or $11.09 (*i.e.*, the floor price) on (1) March 31, 2024, (2) March 31, 2025, and (3) March 31, 2026.[39]

Section 10 of the Stockholders' Agreement sets forth the Director-Designation Right. This right provides that the Board shall be comprised of seven directors.[40] Of these seven, LGE will designate four (the "LG-Affiliated Directors").[41] If certain conditions are met, the "Employee Key Holder Majority" can designate, at most, the remaining three directors (the "Common Directors").[42] There are two requirements the Key Holders must satisfy to exercise this right.[43] First, they must collectively hold a requisite percentage of Alphonso's outstanding Capital Stock. The percentage of ownership held corresponds to the number of directors the Employee Key Holder Majority can designate.[44] The Employee

---

[38] *Id.*

[39] *See id.* §§ 11, 1.42, 1.43, 1.29; JX0040 §§ 1.5(b), 1.5(j), 1.5(s), 1.5(kk) (December 18, 2020, Common Stock Purchase Agreement).

[40] JX0050 § 10.1.

[41] *Id.* § 10.2(a). The Stockholders' Agreement defines "LGE" as "Zenith Electronics LLC . . . and its affiliates." *Id.* § 1.27.

[42] *Id.* § 10.2(b). The Stockholders' Agreement defines the "Employee Key Holder Majority" as "the Key Holders who are directors, officers or employees of [Alphonso] at such time (the 'Employee Key Holders') holding a majority of the shares of Capital Stock then held by all Employee Key Holders." *Id.* § 6.2.

[43] *See id.* §§ 10.2(b), 6.2.

[44] *See id.* § 10.2(b).

9

Key Holder Majority could designate three directors "during such time as Key Holders hold at least twenty percent (20%) of the outstanding shares of Capital Stock."[45] But if the Key Holders' cumulative holdings fall between 10% and 15%, the Employee Key Holder Majority could only designate one director.[46]

Second, to exercise the Director-Designation Right, at least one of the Key Holders must be an Alphonso officer or employee (*i.e.*, the Designation Condition).[47] Section 10.2(b) concludes with the following: "For the avoidance of doubt, this director designation right by the Employee Key Holder Majority under this Subsection 10.2(b) shall be null and void if no Key Holder serves as an officer or employee of the Corporation at such time[.]"[48]

Under Section 10.3(a), no director may be removed unless "(i) such removal is directed or approved by the affirmative vote of the Person(s), or of the holders entitled under Subsection 10.2(a) or (b) to designate that director" or "(ii) the Person(s) originally entitled to designate or approve such director or occupy such Board seat pursuant to

---

[45] *Id.* § 10.2(b)(i).

[46] *Id.* § 10.2(b)(iii).

[47] *Id.* § 10.2(b).

[48] *Id.* The bargaining history over this term is relevant. The parties designed the Designation Condition to align the Key Holders' interests with LGE's. Hahm's deposition testimony explained that the purpose of the Designation Condition was to make sure the Key Holders had "skin in the game." JX0648 94:25–95:13 (Hahm); *see also id.* 79:21–80:4 (Hahm). By which, he meant that he structured the Stockholders' Agreement "for employees to want to work at the company, to build value because by building value they're also benefiting from the value increase in their own pocket through stock options and other programs and owning equity. So that was the intent." *Id.* 94:25–95:13 (Hahm). And build value they did. *See infra* Section I.D.

10

Subsection 10.2(a) or (b) is no longer so entitled to designate or approve such director."[49] This brings Section 10.2(c) into play. Where there is no Director-Designation Right, such removals under Section 10.3(a)(ii) create vacancies that can be filled pursuant to Section 10.2(c). Section 10.2(c) provides that the vacant seats of the Common Directors shall be filled through appointment "by the holders of Capital Stock entitled to vote in accordance with applicable law and the Restated Certificate."[50]

Additionally, Section 13.1(b)(iii) provides that the Stockholders' Agreement "shall terminate" upon:

> The execution of a written instrument by (x) the Corporation, (y) LGE and (z) the Employee Key Holder Majority. For the avoidance of doubt, such execution by the Employee Key Holder Majority shall not be required if no Key Holder serves as an officer or employee of the Corporation at such time.[51]

Given these mechanics, it might seem that the Director-Designation Right requires protection of its own. Plaintiffs identify Section 12.1 as the express contractual safeguard of this right. Section 12.1 provides the following:

> [Alphonso] agrees to use its *reasonable efforts*, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the Parties enjoy the benefits of this Agreement. Such actions include, without limitation, the use of the Corporation's reasonable efforts to cause the nomination and election of the directors as provided in this Agreement.[52]

---

[49] JX0050.

[50] *See id.*

[51] *Id.*

[52] *Id.* (emphasis added).

This protection aside, the Director-Designation Right does not, by itself, seem to provide any meaningful degree of influence. But when considered in connection with the Veto Right, its significance materializes. Specifically, Section 10.5(d) conditions the Board's ability to engage in certain actions on the "affirmative consent or vote of at least one Common Director[.]"[53] The actions subject to this Veto Right include (1) postponing an IPO beyond December 2025, (2) postponing or modifying the tender offers, (3) entering into related-party transactions between Alphonso and LGE, subject to certain exceptions, and (4) determining fair market value for the scheduled tender offers.[54]

The Veto Right does not restrict the Board's "exclusive right" to "hire or employ, terminate employment, appoint position and determine the compensation and benefits of executive officers of [Alphonso] and any employee" who receives annual compensation equal to or exceeding $500,000.[55]

As these terms demonstrate, LGE got control, and, in exchange, the Key Holders got cash upfront and the "slow exit"[56] embodied in the Liquidity Rights. Until the exit, the Key Holders would appoint directors to watch over and preserve the Liquidity Rights. At the Board level, the Common Directors could not do anything on their own other than block

---

[53] *Id.* § 10.5(d). Section 11.2(a) uses this same language to condition the Board's approval of the fair market value per share at the time of each scheduled tender offer.

[54] *See id.* §§ 10.5(d), 11.2(a).

[55] *See id.* § 10.5(c).

[56] *See* JX0008 at 2.

certain attempts to interfere with the Key Holders' Liquidity Rights.  This was the bargain.

And indeed, this bargain mirrored LGE's earlier promise that it would "work together with

[the Founders] to come up with a scheme that makes sense for all parties involved to allow

some trigger-based method to allow for a slow exit."[57]

### 3.  Closing

The deal closed in December 2020.[58]  LGE, through Zenith, invested roughly $78

million in total in exchange for over 55% of Alphonso's stock at $11.09 per share based

on a $110 million valuation.[59]  Following the sale, Zenith contributed to the creation of

Alphonso's stock option pool, which reduced its holdings to 50.1% on a fully diluted

basis.[60]  In conjunction with these transactions and in addition to the protections provided

in the Stockholders' Agreement, the Key Holders received considerable upfront payments

from Zenith.[61]  As Defendants point out, Kalampoukas received over $5.5 million, Chordia

received over $3.5 million, Kodige received over $2.4 million, and both Andrades and

Sarma received over $1 million each in these upfront payments.[62]

---

[57] *Id.*

[58] *See* JX0050; JX0040; TT 68:1–4 (Chordia).

[59] *See* JX0250 at 12; JX0040 § 1.5(j); JX0407 at 286.

[60] *See* JX0407 at 286; TT 163:8–14 (Chordia); Pre-Trial Stipulation ¶¶ 13, 32.

[61] *See* JX0041 at 56–57.

[62] *Id.*

13

After the deal closed, the Employee Key Holder Majority exercised the Director-Designation Right and appointed Chordia, Kodige, and Kalampoukas to the Board as the Common Directors.[63] Pursuant to Zenith's right to appoint LG-Affiliated Directors, it also named four members to the Board.[64]

## C. Post-Closing Conflict

The parties' relationship started off well. But friction soon developed. Chordia and Kodige did not get along well with the LG-Affiliated Directors and the other LGE employees with whom they interacted.

Chordia and Kodige's unwillingness to abide by the established chain of command proved a consistent point of tension. This is perhaps one of the clearest illustrations of the overarching clash between LGE's relatively buttoned-down, hierarchical culture and Alphonso's horizontal startup culture. LGE had an established team that managed its relationship with Alphonso: this included primary contacts, Edward Lee and Jo.

The record is littered with emails from Chordia and Kodige to LGE's higher-ups, including Sangwoo Lee and Hyoung-Saeyi Park (Edward Lee and Jo's bosses), William Cho (LGE's CEO), and Doo-Yong Bae (LGE's CFO). These emails were seldom pleasant and often denigrating toward Jo and Edward Lee. In a frustrated email to Chordia, Edward

---

[63] Pre-Trial Stipulation ¶ 34.

[64] Pre-Trial Stipulation ¶ 35.

14

Lee explained that "your counter partner of LGE is not Sangwoo but me. So [s]top contact[ing] him directly with my business matter."[65]

This was not the only area of tension between Alphonso and LGE. Among other things, disputes arose over Alphonso's use of LG's brand name, executive officer hiring without Board approval, refusal to comply with LGE's data-privacy audit requests, depletion of Alphonso's stock option pool, and transfer pricing for ad inventory, as well as a variety of other professional and interpersonal conflicts.

In addition to the companies' cultural differences, some of this friction derived from differences in Chordia's and LGE's objectives. LGE had long-term goals that required cautious integration of Alphonso's ACR technology into its smart TVs.[66] By contrast, Chordia and many of the Key Holders were focused on getting to an IPO.[67] Although LGE was on board with the idea at the beginning, it soon became less accommodating and sought strategic flexibility in that area.[68]

---

[65] JX0128 at 1.

[66] TT 493:8–19 (Edward Lee).

[67] JX0067 (forwarded Slack message from Chordia to Edward Lee on March 3, 2021, explaining that "[f]rom now to March 2024 is about 1000 days. That's all we have!" to get to IPO, and outlining items for Alphonso to do to achieve that goal).

[68] *See* JX0105 at 2 (May 17, 2021 email to Chordia: "LGE would fully support Alphonso going public with revenue goal stated above and valuation above $1B . . . ."); JX0148 at 2 (August 21, 2021 email from Hyoung-Saeyi Park), 3 (August 19, 2021 email from Chordia providing notes from August 17, 2021 WebEx meeting with Sangwoo Lee, Edward Lee, and Hyoung-Saeyi Park); JX0182 at 2 (December 7, 2021 email from Edward Lee).

### 1. LG Ads

In March 2021, Chordia decided to "rebrand" Alphonso as "LG Ads" without receiving authorization to do so from LGE.[69] Chordia explained that this move was inspired by the need to be recognized in the market as being affiliated with LGE and Chordia's belief that the market was already beginning to call Alphonso "LG Ads."[70] In an email to Edward Lee, Chordia revealed that the rebranding was one part of his overarching plan to get to an IPO by March 2024.[71] As part of this rebranding, Chordia went so far as to launch an LG Ads website, which, after domain issues arose, redirected viewers to an online gambling website.[72]

---

[69] TT 110:18–112:17 (Chordia); *see also* JX0653 255:9–14 (Chordia).

[70] *See* TT 196:6–197:13 (Chordia). As a practical matter, Chordia's use of the name "LG Ads" was not wholly unfounded since similarly situated companies had rebranded themselves as "Roku Ads," "Samsung Ads," and "Vizio Ads." TT 196:6–197:13 (Chordia); *see also* JX0096 at 1; TT 211:2–19 (Kodige). Chordia's correspondence on this subject, however, illustrates his unfortunate penchant for being provocative and offensive with LGE team members and senior executives. Chordia asserted in an email to Sangwoo Lee that Alphonso might as well be "rebranding to dominate the ballsy advertising business" and "calling itself Large Gonads Advertising" with "LG Ads" being simply a "short form" version of that title. JX0096 at 3.

[71] JX0067.

[72] TT 111:4–10, 113:14–115:1 (Chordia); JX0067 at 1.

16

After learning of this, LGE asked Chordia to take the website down.[73] While Chordia agreed and did take the website down, he put it back up shortly thereafter—again without LGE's permission.[74]

In what would be just one of many communications sent to Edward Lee's boss, Chordia explained in a May 2, 2021 email to Sangwoo Lee that "[a]sking our team to take down our website — a request we entertained for over two weeks at the cost of business and hiring — or change to some other branding instead of LG Ads just does not work."[75]

This issue continued as an ongoing fight between Alphonso and LGE until well after Kodige replaced Chordia as Alphonso's CEO in July 2021.[76] But it was not the last time Chordia would cause conflict.

---

[73] JX0653 255:5–257:13 (Chordia).

[74] *Id.* 256:8–17 (Chordia); TT 116:4–10 (Chordia). In an email to Sangwoo Lee, Chordia acknowledged the cultural disconnect between LGE and Alphonso. JX0096 at 1–2. Chordia wrote that in contrast to what he saw as LGE's rigid hierarchical structure, "we work [based] on reason. We solve problems. No real reason has been presented, nor a problem that cannot be solved, for us to be called LG Ads. I had gifted our team 'No rules rules' which describes the Netflix culture and ours is similar." *Id.* at 1–2.

[75] JX0096 at 2.

[76] *See* TT 202:21–24, 211:2–212:10 (Kodige).

## 2. Serge Matta

Chordia hired a new President, Serge Matta in April 2021.[77] And he did so without the Board's required approval.[78] Matta had been an advisor to Alphonso since 2017, during which time he was also the CEO of Comscore Inc.[79] Chordia had disclosed to Edward Lee, who at this time was an LG-Affiliated Director, that Matta had some run-ins with the SEC.[80] But Chordia did not disclose the full extent of those issues, which included Matta settling accounting and disclosure fraud charges and Comscore paying over $5 million in penalties.[81] Additionally, the settlement terms prohibited Matta from serving as an officer or director of a public company for ten years.[82]

After these issues came to light, controversy ensued. Although based partially on Chordia's choice of hire, the controversy also centered around Chordia's ability to hire a President for Alphonso. Section 10.5(c) of the Stockholders' Agreement gave the Board the "exclusive right" to hire executives and those compensated $500,000 or greater—of which Matta was both.[83] Responsive to these issues, Chordia prepared a timeline of the

---

[77] TT 138:2–7 (Chordia); JX0082.

[78] TT 138:2–7 (Chordia); *see also* JX0082 (Matta Offer Letter); JX0050 § 10.5(c).

[79] *See* JX0007 (Matta Press Release).

[80] JX0007; TT 138:2–147:2 (Chordia).

[81] JX0007; TT 138:2–147:2 (Chordia).

[82] JX0007.

[83] TT 150:24–151:5 (Chordia); *see also* JX0082. Section 10.5(c) permits the Board to hire executive officers with a simple majority. With the Common Directors occupying

18

events leading to Matta's hire, which purports to involve discussions of the Comscore SEC issues with Alphonso's General Counsel Cushing, who was also previously employed by Comscore and worked in its legal department at the time of the events giving rise to the SEC's fraud investigation.[84]

At trial, Chordia testified that he understood that Board approval was required to hire Matta.[85] But the evidence at trial demonstrated that notwithstanding this belief, Chordia also asked Steve Wheeler, Chordia's "long-term" personal lawyer, for an opinion that the role of president is not an executive office—an opinion which Wheeler declined to provide.[86]

Although the Board later removed Matta from his role as President, he stayed on in a senior management role where he remains.[87]

---

three of the Board's seven seats, I acknowledge that LG-Affiliated Director Edward Lee's favorable response to Chordia's proposal to hire Matta might have led Chordia to believe— as he testified at trial—that he had the necessary Board majority to hire Matta under Section 10.5(c), assuming approval by the other Common Directors. *See* TT 151:17–22 (Chordia).

[84] *See* JX0157 at 10; TT 150:6–9, 148:8–16 (Chordia).

[85] TT 150:14–16 (Chordia).

[86] TT 151:3–10 (Chordia).

[87] TT 151:23–152:4 (Chordia). Matta is now Alphonso's head of advertising and sales. *See* TT 414:3–6 (Durgin).

### 3. Data Privacy

Disputes also arose from data privacy and compliance concerns. A 2017 New York Times article lent weight to these concerns.[88] The article specifically named Alphonso and quoted Chordia while purporting to detail "questionable [data privacy] practices" by companies like Alphonso.[89] Before joining Alphonso's Board and acting as Vice President and General Counsel of LG US, Wasinger requested that Alphonso undergo a privacy audit by a law firm.[90] Wasinger was clear that LGE wanted the audit to be conducted by a law firm and went so far as to invite Alphonso to propose the law firm that should conduct the audit.[91]

In response, Chordia insisted that, instead of a law firm audit, Alphonso would only be willing to conduct a standards-based review.[92] Amidst the numerous emails sent on this

---

[88] *See* JX0630.

[89] *Id.*

[90] JX0101 at 2.

[91] *Id.* at 1–2 (May 6, 2021 email from Wasinger to Cushing: "It is very important that the audit report and related audit communications be privileged, so it should be a law firm that manages."); *see also* JX0128 at 4 (email from Edward Lee to Chordia on June 8, 2021, stating that "we need LG Ads to proactively participate in the privacy audit le[]d by LGEUS['s] legal team. This action item is not optional but mandate[d] for all LGE subsidiaries."); JX0168 at 1–2 (October 21, 2021 email from Wasinger to Cushing: "As I have repeatedly stated since May, this review is merely reasonable due diligence on privacy and security standards before Alphonso ACR technology is integrated in LG televisions and other LG Pll is shared with Alphonso for its business." "I am concerned that Alphonso management has been delaying and throwing up roadblocks for months. The review should have been completed this summer, and now the timeline is extremely compressed.").

[92] *See, e.g.*, JX0128 at 4.

20

topic is a May 9, 2021 email that Chordia sent to Sangwoo Lee.[93] Therein, he referred to Wasinger's attempts to move forward with a law firm-based audit as "overreaching and totally unnecessary" as LG US had "no authority over Alphonso and they can go fish."[94] Despite recognizing the obligations, procedures, and even abundance of caution with which large corporations like LGE operate,[95] Chordia premised his resistance to a law firm audit on his belief that there was limited up-side for Alphonso.[96]

Like with the LG Ads issue, this was a repeated point of tension that the parties did not resolve until the end of 2021, several months after Kodige replaced Chordia as Alphonso's CEO.[97]

### 4. Depletion Of The Stock Option Pool

The depletion of the stock option pool generated more conflict. The pool was created after LGE's investment and had the effect of diluting LGE's holdings from over 55% to 50.1%. But in March 2022, Alphonso ran out of available stock options.[98] Chordia

---

[93] *See* JX0101 at 1.

[94] *Id.*

[95] *See* TT 121:13–17 (Chordia).

[96] JX0128 at 2–3 (June 2021 emails from Chordia and Cushing to Edward Lee and Wasinger, explaining that "[t]he problem with an outside audit being performed by a law firm is that while it may provide LGE with some degree of comfort, it otherwise provides no benefit upon Alphonso or LG").

[97] *See* TT 213:21–216:13 (Kodige).

[98] TT 163:15–17 (Chordia).

21

explained that "[g]rowth led to hiring and hiring led to a depletion of the stock option pool."[99] After running out of stock options, Chordia asked LGE to replenish the pool.[100] This was an option that Chordia understood would likely require LGE to dilute its ownership and leave LGE with less than 50% of Alphonso.[101]

Despite several exchanges and attempts to formulate a solution, Alphonso and LGE were unable to resolve this issue.[102] In response to these unsuccessful attempts, Kodige, who by this time had taken over as CEO, sought to escalate the issue to LGE executives. In December 2022, Kodige emailed LGE's CEO and CFO (Cho and Bae, respectively) to describe the pool depletion issue and what he viewed as LGE's "egregious" approach to "expanding the Options pool" and Jo's inability to resolve the challenges Alphonso faced.[103]

### 5. The Inventory Agreement

In April 2021, Alphonso and LGE entered into an agreement related to LGE's sale of ad inventory to Alphonso.[104] The price term for the inventory was left open and the ad

---

[99] TT 164:1–2 (Chordia).

[100] TT 164:24–166:1 (Chordia); *see also* JX0246.

[101] TT 164:24–166:1 (Chordia).

[102] *See, e.g.*, TT 174:7–176:22 (Chordia).

[103] JX0510 at 1–2.

[104] Pre-Trial Stipulation ¶¶ 38–39; JX0196 at 7–14 (original agreement).

22

inventory LGE provided to Alphonso during 2021 was considered a "free trial."[105] After negotiating pricing terms for 2022, the parties amended the agreement in January 2022 (the "Inventory Agreement").[106] This amendment included the insertion of transfer price terms.[107] The parties set pricing terms that were favorable to Alphonso and lower than the price Alphonso paid for inventory from third parties.[108] But shortly after the amendment, LGE tried to change the "mutually agreed upon" transfer price.[109] It also tried to apply the change retroactively.[110] Durgin believed this to be a "terrible" and "dumb idea" since, as he confirmed, "no leader of Alphonso should agree to amend the transfer price in the inventory agreement to raise the transfer price to benefit LG at the expense of

---

[105] *See* JX0212 at 26 ("All LG Ad Inventory provided by LG to Alphonso prior to January 1, 2022 shall be provided as a free trial; no fees shall be payable by Alphonso for any LG Ad Inventory provided prior to January 1, 2022.").

[106] Pre-Trial Stipulation ¶¶ 38–39; JX0212 at 25–30; JX0347 at 1–8. The Inventory Agreement was structured so that Alphonso agreed to buy LGE's global ad inventory at fixed prices. Accordingly, the Inventory Agreement itself stated that, "[f]or the avoidance of doubt, Alphonso bears all economic benefits and burdens associated with any LG Ad Inventory purchased by Alphonso, regardless of whether the same is sold or otherwise monetized." JX0212 at 25. Either side could unilaterally terminate the Inventory Agreement "for convenience upon 60 days prior written notice to the other party." JX0196 at 8; *see also* TT 177:10–17 (Chordia).

[107] TT 178:4–10 (Chordia); JX0212 at 25–30; JX0347 at 1–8.

[108] TT 179:3–15 (Chordia).

[109] JX0386 at 14.

[110] TT 486:3–21 (Durgin).

23

Alphonso[.]"[111]  LGE's internal documents noted the LG-Affiliated Directors' fiduciary obligations in addressing this issue.[112]  It directed them to "[a]pproach the matter as a compliance risk issue" specifically "to prevent fiduciary duty issue pertinent to LG Directors (fiduciary duty, decision-making from Alphonso's stance), approach the matter with focus on tax risk."[113]  This was indeed the rationale LGE put forth.[114]

Alphonso took the tax compliance concerns seriously and conducted its own investigation into the matter and had PwC conduct its a review of KPMG's original study.[115]  In September 2022, PwC concluded that, "[b]ased on our review, the arm's length prices for LG Ads Inventory identified in the KPMG Transfer Pricing Analysis appear reasonable and consistent with the arm's length standard outlined in the Section 482 Regulations."[116]  PwC further concluded that the Inventory "Agreement is 'commercial grade' in substance and appearance, including the length of its term which is consistent

---

[111] TT 486:3–21 (Durgin); *see also* JX0397 at 1 (October 28, 2022 email from Durgin to the LGE team, expressing concern over "the idea that LG will put a new leader who would negotiate from the POV of the other party in the agreement, then take an existing price and raise it not in the best interests of his/her company, but in the best interest of LG" since this "is not what I'd expect out of any new business leader").

[112] *See* JX0312 at 20.

[113] *Id.*

[114] *See* TT 179:15–21 (Chordia).

[115] JX0386 at 13; *see also* JX0358 at 1.

[116] JX0358 at 12.

with similar independent contractual agreements."[117]  Notwithstanding these conclusions, LGE was not satisfied and the parties continued to dispute the sufficiency of the transfer price into late fall 2022 with no meaningful resolution.[118]

### 6. The Divided Board Of Alphonso

Interwoven with the foregoing is an undercurrent of conflict and accusations of unprofessional behavior.  For example, the Board often failed to approve meeting minutes promptly.  This led Chordia, over the objection of his colleagues and against Wheeler's advice, to insist that he record Board meetings.[119]  Kodige, in an October 10, 2022, email to Hyoung-Saeyi Park and Cho, addressed this issue and used it to illustrate "how incompetent" the Board purportedly was.[120]

On another occasion, in response to an inquiry by Edward Lee over a competing product that he believed Alphonso was developing, Kodige sought Edward Lee's removal from the Board.[121]  In his December 6, 2021, email to Hyoung-Saeyi Park and Sangwoo Lee, he asserted that "Edward and team have very badly managed Alphonso investment and relationship over the past year[]" and describes what he asserted was "Edward's erratic

---

[117] *Id.*

[118] *See* Dkt. 194 Defendants' Post-Trial Answering Br. ("Defendants' Post-Trial Answering Br.") at 26–27.

[119] *See, e.g.*, JX0328 at 1–6.

[120] JX0376 at 1.

[121] JX0180 at 2.

[and] disrespectful behavior."[122]   This email concluded with the following: "We need to urgently address Edward's behavior.  We request that Edward be removed from working with Alphonso team [*sic*] right away and also be removed from our board."[123]

In addition to the numerous attempts to escalate issues to LGE's senior executives, there is also some evidence that Chordia and Kodige were disruptive during Board meetings.[124]  Moreover, the type of language that Chordia and Kodige used also served as a source of conflict.  Chordia was not hesitant to use profane or crass language in his regular communications with LGE executives and employees and the LG-Affiliated Directors.  Among some of his emails, Chordia used phrases like "[f]**k you sangwoo,"[125] "don't f**king try to sugar coat the mess,"[126] "we don't know f**king LG English,"[127] and "get[ing] sh*t" done."[128]  At another point, Chordia asked the LGE team to "please respect

---

[122] JX0180 at 1–2.

[123] *Id.* at 2.

[124] TT 576:17–577:19 (Wasinger); TT 672:8–15, 678:4–18 (Jo); *see also* JX0278 (Wasinger's email).

[125] JX0143 at 3 (profanity edited).

[126] *Id.* at 2 (profanity edited).

[127] *Id.* (profanity edited).

[128] JX0128 at 1 (profanity edited).

26

the [LG Ads] team you have here like they are sent from God" because "[t]hat's your only hope to make this company work."[129]

Despite what by all accounts was a divided board, there remained no meaningful gridlock because the LG-Affiliated Directors controlled a majority of the Board seats.[130] As time would show, the LG-Affiliated Directors even terminated the executive-officer Key Holders without gridlock because, with four seats on the Board, they controlled Alphonso's trajectory.[131] The LG-Affiliated Directors only needed a Common Director's approval to interfere with the Key Holders' Liquidity Rights, or to enter related-party transactions between Alphonso and LGE.[132] At bottom, this is what the parties had bargained for.

---

[129] JX0143 at 2.

[130] At trial, Wasinger testified to the contrary. TT 586:18–587:1 (Wasinger) ("It was just a litany of problems" and "gridlock had developed."). Although I agree that Chordia and Kodige's conduct was decidedly unpleasant, I also like to think (or at least hope) that I am not naïve. As I discuss later in this decision, Chordia and Kodige seemed to turn invariably to the least diplomatic of approaches when given a choice. But they are by no means the first entrepreneurs who have sought to "move fast and break things" and to be quite successful in doing so. In summary, I found Defendants' drumbeat evidentiary presentation on Chordia and Kodige's rough manner, and Wasinger's testimony in particular, overreaching and intended more to "poison the well" than anything else. Although it is not disputed that the Board was divided, the record belies the notion that the *Board* was gridlocked in any meaningful way.

[131] *See* JX0536 at 3.

[132] *See* JX0050 §§ 10.5(d), 11.2(a).

**D. Alphonso's Continued Success**

Notwithstanding the division and disputes, Alphonso thrived. Alphonso exceeded the high revenue targets that LGE set and grew to a 300-person work-force.[133] In the two years that followed closing, Alphonso produced $78 million and $270 million in revenue.[134] This greatly exceeded LGE's initial targets for Alphonso.[135] By December 2022, Alphonso was valued at over a $1 billion—nearly ten times its valuation at closing.[136] And around that time, LGE's own internal correspondence confirms that Alphonso's value had risen to upwards of $1.4 billion.[137]

On the technical side, Alphonso also out-performed LGE's expectations. In this regard, Alphonso brought the ACR technology to the point that it could be integrated into LGE's smart TVs *far ahead* of schedule.[138] Both sides contributed meaningfully to this success, but LGE wanted a better deal than the one it had bargained for.

---

[133] TT 247:3–12 (Kodige).

[134] TT 247:13–248:20 (Kodige); TT 42:16–44:7 (Chordia).

[135] TT 247:13–248:20 (Kodige); TT 42:16–44:7 (Chordia).

[136] TT 247:13–248:20 (Kodige).

[137] JX0463 at 5.

[138] TT 247:13–248:20 (Kodige); *see also* JX0183 at 5 ("The teams have taken what was a 2 year roadmap and shrunk it down to 2 months.").

28

### E. Project Wall-E: War

Project Wall-E was developed for the purpose of taking control from the Key Holders. While Project Wall-E was developed more explicitly in late-2022, the lead-up to its execution began several months earlier.

#### 1. Genesis

In March 2022, Jo began working for LGE.[139] That same month, Jo took a seat on Alphonso's Board as an LG-Affiliated Director.[140] In April 2022, Jo met with Kodige and communicated to Kodige that LGE was wavering on the idea of an IPO.[141] This was opposite the commitment to an IPO that LGE had communicated to the Key Holders the year prior.[142] Shortly after joining the Board, Jo tried to have Kodige hire Sexton, whom Jo believed was a "market industry veteran, that . . . could help the Alphonso business."[143] In conjunction with his request, Jo set up a call with Sexton in early May 2022.[144]

Sexton took contemporaneous notes during the meeting, which he then emailed to himself after the meeting ended.[145] Among other things, Sexton's email draws attention to

---

[139] TT 685:10–12 (Jo).

[140] TT 685:24–686:5 (Jo).

[141] *See* JX0247 at 1.

[142] *See* JX0105 at 2; JX0148 at 2; JX0182 at 2.

[143] TT 690:2–691:7 (Jo); *see, e.g.*, JX0267 at 8.

[144] JX0640 26:15–18 (Sexton).

[145] *See* JX0253; TT 693:17–694:12 (Jo) (affirming in relevant part that "these notes reflect the substance of a call that [Jo] had with Mr. Sexton on or about May 6[,]" 2022).

the details surrounding the deal LGE had struck with the Key Holders and LGE's desire to get "a return on their investment."[146] Although noting that LGE initially "wanted to see if they can IPO," the email states that things may have changed and LGE "may have bigger plans."[147] Sexton's email also draws attention to Alphonso's culture, which the email described as a "[m]ixture between Indian Culture [and] SV culture" and repeatedly explained that "LG has a lot of difficulty managing this organization[.]"[148]

Sexton's email also describes a version of the blueprints for what would later become "Project Wall-E,"—the project that Jo would go on to "[c]hampion."[149] The email, while recognizing that the Board "made [Chordia] step down [from CEO] to Board Member [and] Chief HR Officer," further describes a "[g]oal to remove him from whatever role" and "[b]ring in new upper management."[150] Sexton's email also includes a clear motivation for carrying out this strategy—Jo viewed Alphonso as "1 of 3 pillars" in Jo's overarching goal to bring together "Adv, content, WebOS."[151] Kodige, however, rejected

---

[146] JX0253 at 1–2.

[147] *Id.* at 1.

[148] *Id.* at 1–2.

[149] *See* JX0435 at 18; TT 687:14–688:10 (Jo).

[150] JX0253 at 1–2; *see* TT 692:8–698:6 (Jo).

[151] JX0253 at 1. Jo's trial testimony confirmed this general sentiment. TT 687:4–13 (Jo) (affirming that he "want[ed] Alphonso to stay, to play the same role that it does today in the business").

Jo's recommendation to hire Sexton, so nothing came of this initial attempt to seize full control.[152]

On May 16, 2022, after Jo's call with Sexton, Jo and Hyoung-Saeyi Park attended a meeting with Chordia and Kodige during which disagreement arose over Alphonso's strategic future.[153] At this meeting, Kodige and Chordia proposed two options for moving forward. The first option would make Alphonso a combined entity that included LGE's "Content + Advertising"[154] and "[i]inventory ownership."[155] Beotra explained a similar idea at his deposition. There, he noted that "[y]ou cannot take an entity public where it has one contract, which, if the contract is snapped, kills the investor story."[156] Thus, he had previously proposed a similar idea—that "instead of having an inventory agreement and transfer pricing, that LG transfer the inventory to [Alphonso] outright[.]"[157]

The second option, should LGE refuse the first, asked LGE to buy out the Key Holders.[158] While at trial, Defendants made much of the May 16 meeting, it proved little more than the Key Holders' request that LGE back them in their pursuit of an IPO or buy

---

[152] TT 691:16–18 (Jo); JX0267 at 7.

[153] TT 688:18–689:15 (Jo).

[154] JX0261 at 21.

[155] JX0259 at 2.

[156] JX0647 179:2–22 (Beotra).

[157] *Id.*

[158] *See* JX0259 at 2; JX0261 at 21.

31

them out. But, as Sexton's email showed, Jo and LGE had already begun to develop an alternative plan for Alphonso's strategic future.

In June 2022, Jo stepped down as an Alphonso Board member. He asserted that this was "to avoid a potential conflict" given his continuing role as an LGE employee.[159] Wasinger replaced Jo as an LG-Affiliated Director on Alphonso's Board.[160] But at all relevant times Wasinger also served as Vice President and General Counsel of LG US.[161]

Even before officially starting his additional role as a Board member, Wasinger began to paper the record. For example, after Wasinger attended a Board meeting on June 20, 2022, as an observer, he sent an email to LGE executives and the LG-Affiliated Directors recounting Chordia and Kodige's "incredibly disrespectful, outrageous, and

---

[159] *See* TT 686:6–12 (Jo).

[160] *See* TT 574:7–9, 594:15–17 (Wasinger); TT 351:2–17 (Kalampoukas).

[161] TT 593:10–15 (Wasinger).

unproductive" behavior.[162] Wasinger explained Chordia and Kodige's "abusive tactics" in which they would "gang up"[163] on other Board members and launch "personal attacks."[164]

Around the same time, LGE began looking for ways to terminate the Stockholders' Agreement to create strategic flexibility and avoid their obligations to the Key Holders. Specifically, LGE began looking for the "Nuclear Bomb option" in the Stockholders' Agreement.[165] In response to this inquiry, Hahm explained:

> In the Shareholders Agreement, clause 6.2, it defines Employee Key Holder as a person who is listed as a Key Holder AND who is also employed by the Company. In clause l0.2(b), only Employee Key Holders can place a person on the Board. Therefore, if we fire all the Key Holders, they have no ability to place a person on the Board. And, remember that we can fire anyone at anytime. After we fire the Key Holders, the new Board (filled with LGE people) can alter or change . . . and terminate the Shareholders Agreement.

---

[162] JX0278 at 1. *But see* TT 656:17–657:8 (Kalampoukas) ("I never experienced any behavior like that. They never ganged up, they never abused, they never used foul language. They never personally attacked any of the other board members. In fact, I don't recall even ever raising their voice in the meeting. As I testified, there were disagreements, there were discussions, but that was the extent of it."). I acknowledge Chordia and Kodige's impatience, lack of decorum, written profanity, and "in your face" interpersonal style. Certainly, Chordia and Kodige did not adhere to the adage that you catch more flies with honey than vinegar. Having observed his testimony, however, I also found Kalampoukas to be a credible witness at trial. Ultimately, I conclude that Chordia and Kodige were extremely confident in their opinions and uninhibited in sharing them, often coming across as discourteous and direct to a fault in doing so. This was all likely unpleasant and annoying for LGE, but, frankly, little more than that in terms of impeding the work of the Board. *See also* JX0515 (video recording of December 16, 2022 Board meeting).

[163] JX0278 at 1.

[164] TT 576:10–577:1 (Wasinger).

[165] *See* JX0275 at 3 ("What is the Nuclear Bomb option in the provisions?").

33

Termination of the Shareholders Agreement removes all obligation in the Shareholders Agreement, which includes IPO, tender offer, etc.[166]

Hahm recounted this same idea in a September 9, 2022 email.[167] This time, he drew attention to the corresponding relationship between the Key Holders' ownership of certain percentages of Alphonso's stock and the number of Common Directors the Key Holders can designate under Section 10.2(b).[168] Hahm connects this to the fact that the "Board protections stay in place with just one Board seat."[169] Hahm concludes this idea with the following:

> Remember our nuclear option: if you want to alter or remove the Stockholder Agreement, you need to fire them all. But if you do this, it will shock all the employees and cause havoc . . . . Please also note, that once you fire Ashish, and they read the agreement and realize the careful wording of section 10.2b of the Stockholders Agreement, they will understand the nuclear option, and they will have more fear and freak out more than now.[170]

---

[166] *Id.* at 6.

[167] JX0336 at 3.

[168] *Id.* at 3. In the email, Hahm asserted that "[o]nce you fire Ashish, his shares will not be counted to calculate the threshold as to how many board seats the Key Holders can fill." *Id.* As I explain below, Hahm's interpretation of the provision in this manner is incorrect. *See infra* Section II.B.

[169] JX0336 at 3.

[170] *Id.* at 3–4.

## 2. Preparing For "D-Day"

By the end of September 2022, LGE's plans to terminate the Stockholders' Agreement began to materialize. Justin Kim (a Wall-E team member)[171] sent meeting minutes to LGE executives and LG-Affiliated Directors from a September 29, 2022 LGE team meeting.[172] Even the meeting's purpose is telling—to "change the management team of Alphonso" and "secure our company's ownership ratio (Super Majority)."[173] But, LGE only pursued these objectives "under the assumption that our company's top management approved aborting the plan for Alphonso's IPO."[174] And indeed, expounding on the latter purpose, the minutes state: "Considering the JV, Alphonso is a key asset of our company. The IPO should be aborted and control must be maintained."[175] At trial, Edward Lee interpreted these minutes to mean that "LG no longer wanted Alphonso to IPO because of the JV."[176]

---

[171] TT 547:18–548:2 (Edward Lee); *see also* JX0365 at 5 (identifying Justin Kim's role as a member of LGE's Business Development Team).

[172] *See* JX0365 at 3.

[173] *Id.* at 3–4.

[174] *Id.*

[175] *Id.*

[176] TT 549:3–13 (Edward Lee).

35

With Jo at the helm, LGE convened a Project Wall-E "task force" by October 2022.[177] Project Wall-E was designed to evaluate the avenues available for replacing Alphonso's leadership.[178] But the plan did not end there.

The task force evaluated at least two primary options: terminating three executives (Chordia, Kodige, and Beotra) and terminating all Key Holders.[179] The task force highlighted certain disadvantages associated with the former, which include that "[t]he rest of key holders [*sic*] can still appoint *Alphonso-friendly* person to a Board members [*sic*], and key holders can still exercise their right to request for S-1 filing, and a veto right."[180] The advantages identified for the latter "nuclear option"[181] included "[n]o IPO and tender offer obligation" and would mean that LGE "[c]an terminate the Shareholders Agreement and the Board can run with only LGE-designated board members[.]"[182] Wasinger also explained that this nuclear option might resolve the outstanding dispute over transfer

---

[177] *See* TT 587:6–20 (Wasinger); JX0400 at 19; JX0435 at 18; TT 687:21–688:14 (Jo).

[178] *See* JX0400 at 19.

[179] *See* JX0402 at 18 ("[Option 1] Terminating only 3 Executives (CEO, CFO, CHRO) [Option 2] Terminating all of [*sic*] Human Key Share Holder (9 in total)") (first and second alterations in original).

[180] JX0402 at 19 (emphasis added).

[181] JX0336 at 6.

[182] JX0402 at 19.

pricing for the Inventory Agreement since "it will be much easier to negotiate pricing and an amendment" with "new Alphonso management."[183]

LGE executives and the LG-Affiliated Directors discussed these options in an LGE team meeting on October 26, 2022.[184] After the meeting, Kim sent an email summary to the group in which he stated: "I believe the key decision we made today was who we will be terminating, and we need to back up our rationale for such termination."[185] "[W]e must prepare good rational [*sic*] (almost, individual level)."[186] Kim "[s]et [their] direction toward termination of all key share holders."[187]

In preparation for the day Wasinger dubbed "D-Day,"[188] the task force compiled a "playbook." Among other things, the playbook identified backfilled "business justification[s]" for Key Holder terminations.[189] Additionally, LGE prepared a document

---

[183] JX0397 at 4; *see also* JX0398 at 3–4 (October 31, 2022 email from Edward Lee in which he explained that so long as they execute "Alphonso's restructuring as soon as possible," it will "resolve the TP issue.").

[184] *See* JX0402 1–3.

[185] *Id.* at 2.

[186] *Id.*

[187] *Id.*

[188] TT 596:15–19 (Wasinger).

[189] *See* JX0487 at "Impacted Employee List" sheet (columns P and Q). Some of the justifications were compiled with a clear lack of specificity and detail. For example, a justification provided for terminating Ashish Baldua was that the "CHRO & Executive Chairman role is no longer needed in the company." *Id.* at P8. But Ashish Baldua never held these roles. Instead, Ashish Chordia did. Indeed, this was not the last time that Chordia would be mistaken for another Key Holder. A recording of the December 16,

37

the parties identify as "Exhibit A." Much like the playbook, this document also included a list of backfilled, and what I find to be largely pretextual, reasons to justify the terminations.[190]

As other internal documents demonstrate, LGE also sought to capitalize on the Key Holders' terminations by acquiring a larger stake in Alphonso for the "[p]urpose" of "[m]itigating the risk of potential litigation from KSH dismissal and SHA termination[.]"[191] LGE planned to acquire this additional ownership by providing the terminated Key Holders with buyout offers. As of November 29, 2022, LGE's internal valuation of Alphonso placed its value between $700 million and $1.4 billion.[192] Using the $700 million valuation, LGE believed Alphonso's share price to be "around $50 per share."[193] Notwithstanding these numbers, Wasinger's December 1, 2022, email reflects his intention "to buy them out at the lowest possible price."[194]

LGE faced few challenges during the planning phase. But one problem did surface. The problem LGE perceived was the Board's inability to fire two non-executive Key

---

2022 Board meeting, in which the LG-Affiliated Directors terminated Chordia, reveals that even while actively firing Chordia, Wasinger repeatedly referred to Chordia as "Raghu" despite Raghu Kodige's absence from the meeting. JX0515.

[190] *See* JX0518 at 4.

[191] JX0463 at 7.

[192] *Id.* at 5.

[193] *Id.*

[194] JX0461.

Holders.[195]  Section 10.5(c) of the Stockholders' Agreement provided the Board with the "exclusive right" to terminate "executive officers," and employees compensated $500,000 or more per year.[196]  But not all Key Holders fell within these categories (*i.e.*, employee Key Holders Andrades and Sarma).  Hence, LGE's "[n]eed" for a "new CEO's cooperation to fire non-executive key holders."[197]

LGE thus set out to find an interim CEO to appoint for the purpose of terminating Andrades and Sarma.  After LGE reviewed several candidates, it settled on Aman Sareen.[198]  Sareen agreed to serve as Alphonso's interim CEO but backed out shortly thereafter.[199]  He explained his reason for doing so in an email to the LGE team: "I will not be able to sleep at night . . . . I just can[']t move forward."[200]  Hyoung-Saeyi Park's November 30, 2022 email corroborates this reasoning.[201]  Therein, he recounted a phone

---

[195] JX0487 at 53 ("New CEO terminates the remainder of 2 Key Holders as employees that Board does not have the power to do itself.").

[196] *See* JX0050.

[197] JX0402 at 19; *see also* JX0487 at 53.

[198] From the time it made the decision to terminate the Key Holders, LGE began reviewing potential CEO candidates.  *See* JX0402 at 27 (referencing another candidate LGE identified as being "LG-friendly").

[199] *See* JX0465 at 2–3; JX0456.

[200] JX0465 at 2.

[201] *Id.*

39

conversation with Sareen, in which Sareen "said he won't sleep well being a person who stabs their back, and he can't really do this."[202]

The next day, LGE "shift[ed] to plan B with Adam Sexton."[203]  Sexton had one primary job duty: "Remove two key holders (Ravi Narayan Sarma and Richard Andrades)."[204]  Believing itself to have resolved the Board's inability to terminate all Key Holders, LGE continued to plan for the terminations and the subsequent termination of the Stockholders' Agreement.

At trial, the parties disputed whether LGE planned to terminate the Stockholders' Agreement in its entirety.  The evidence compels two conclusions.  First, LGE planned to terminate all Key Holders for the specific purpose of causing the failure of the Designation Condition in Section 10.2(b) to terminate the Director-Designation Right.  Indeed, the LG-

---

[202] *Id.*

[203] *See* JX0458.

[204] JX0445 at 8; *see also* JX0640 175:10–13 (Sexton).

Affiliated Directors say as much.[205]  Jo's deposition testimony is in accord.[206]  Second,

after terminating all Key Holders, LGE intended to terminate the Stockholders'

Agreement.[207]

---

[205] TT 443:5–23 (Durgin) ("Q. . . . . The reason that those seven individuals were fired was so that the common directors on the board could be removed; correct? A. That's right. . . . Q. Sure.  You believed that if the key holders were fired, their director-designation right in the stockholders agreement would be null and void; correct? A. That's correct."); JX0657 150:14–20 (Hwang) ("Q. So the answer to my question were the seven key shareholders terminated in order to remove the common directors is yes?  . . . . THE WITNESS: Yes, I think so."); TT 602:4–8 (Wasinger) ("Q. The reason that all of the key holders employed by Alphonso needed to be fired was because that cleared the way for the common directors to be removed; right?  A. From the board, yes."); TT 520:19–23 (Edward Lee) ("Q. And why was the termination of the key holders a mission of Project Wall-E? A. Because we needed new board leadership. So in order to have a new board, we need to remove all the key shareholder.").

[206] JX0656 169:7–12 (Jo) ("Q. Do you understand that some of the individuals terminated on D-Day were terminated in order to remove the key holders right to appoint directors to the Alphonso board? A[.] Yes.").

[207] *See, e.g.*, JX0402 at 19 (October 26, 2022 meeting slide deck: "Pros" of terminating all Key Holders include that LGE "[c]an terminate the Shareholders' Agreement"); JX0435 at 4 (Scope of Work for Project Wall-E: "Dismissal of Alphonso's Directors and Termination of the Shareholders Agreement Extinguishment of our company's obligations for IPO S-Filing and tender offer, etc."); JX0418 at 1 (November 10, 2022 email discussing "D-Day procedures" and identifying step 6: "Board approves termination of SHA"); JX0441 (November 21, 2022 Wall-E Task Governance Review: "After removing 3 BOD seats held by the Key Holders, the restrictive clauses, such as IPO, Scheduled Tender Offer, Co-Sales, etc. should be removed through speedy termination of the SHA."); JX0466 at 18 ("Based on the pros/cons document, no need to terminate stockholder's agreement on D-Day, but need to decide roughly when would be best time to terminate it."); JX0499 at 3–4 (December 14, 2022: "[D]etailed agenda for the Wall-E D-Day and what you are expected to do."  After dismissing three directors, "[o]ur company and Alphonso can terminate the SHA contract."); JX0505 at 1 (Online meeting invitation for December 15, 2022, to discuss "when" to terminate the Stockholders' Agreement); JX0558 at 3 (December 20, 2022 (four days after D-Day): "Additional Question: When do

41

Indeed, just two days before D-Day, Wasinger sent an online meeting invitation to Edward Lee, Durgin, and Hyoung-Saeyi Park scheduled for December 15, 2022.[208] The invitation included a description of the meeting's purpose: "[S]etting up this call for final plans on *when* to terminate the stockholders' agreement as part of Project Wall[-]e."[209]

Three days before D-Day, December 13, 2022, LGE's public affairs team floated several so-called "dreadlines" (*i.e.*, potential negative headlines) to LGE executives.[210] These dreadlines characterized LGE's efforts to seize greater control from the Key Holders as an "LG-led coup," an "LG takeover," and a "hasty Board takeover."[211]

The next day, Wasinger called a special meeting of the Board to be held on December 16, 2022—a meeting which Kodige would be unable to attend.[212] And, despite Chordia's repeated requests for the LG-Affiliated Directors to circulate an agenda, they did not provide one.[213]

These events set the stage for December 16, 2022.

---

you plan to terminate the [Stockholders'] Agreement? . . . . [T]here will not be any issue for as long as the SHA Agreement is terminated within 2023.").

[208] JX0505 at 1.

[209] *Id.* (emphasis added).

[210] *See* JX0500 at 16.

[211] *Id.*

[212] JX0546 at 21; *see also* JX0515.

[213] *See* JX0546 at 18, 19, 20; JX0515.

42

### 3. Invasion

On December 16, 2022 (*i.e.*, D-Day), the Board initiated the "nuclear option."[214] It did so by holding a special meeting in which Wasinger proposed a management reorganization resolution (the "Resolution") to terminate the five executive-officer Key Holders: Kodige, Chordia, Kalampoukas, Beotra, and Baldua.[215] Among other things, the resolution also proposed appointing Sexton as Chief Operating Officer and Interim CEO.[216] All four LG-Affiliated Directors[217] approved the Resolution.[218] During this meeting, Wasinger assured the now-terminated Key Holders that LGE planned to give them buyout offers for their Alphonso shares—offers that he "believed" to be "fair."[219] The price LGE soon thereafter proposed: $16.64 per share.[220]

---

[214] This "nuclear option" was different, and indeed substantially more severe, than the one the parties had discussed during negotiations. *Compare* JX0336 at 3, 6, *and* JX0275 3, 6, *with* JX0023 at 4.

[215] JX0536 at 2–3; *see also* JX0515; Pre-Trial Stipulation ¶ 42.

[216] JX0536 at 2–3; *see also* JX0515; Pre-Trial Stipulation ¶ 43.

[217] On D-Day, the LG-Affiliated Directors were Wasinger, Durgin, Edward Lee, and Hwang. Pre-Trial Stipulation ¶ 35; *see also* JX0515.

[218] JX0515; *see also* Pre-Trial Stipulation ¶ 42. Hwang signed the Resolution the day prior to the Board meeting. *See* JX0530 at 11.

[219] JX0515; JX0528 at 4.

[220] *See* JX0544 § 2.1.

43

Immediately following the Board's meeting, Sexton, as Interim CEO, terminated non-executive-officer Key Holders Andrades and Sarma.[221] But notwithstanding the contentious manner in which Alphonso, acting through Sexton, terminated Andrades and Sarma, they both demonstrated a highly cooperative spirit and were clearly valued members of their respective teams at Alphonso. For example, before Sareen withdrew his acceptance of the CEO role, he expressed his clear desire to keep Sarma on his team after D-Day.[222] Hyoung-Saeyi Park also sought to bring Sarma back to Alphonso as a consultant.[223]

Even after being terminated, both Andrades and Sarma continued to help their respective Alphonso teams.[224] Credible trial testimony demonstrates that each was involved extensively in the knowledge transfer process—a knowledge transfer process that Alphonso only became aware it needed when Andrades (while still in his termination meeting with Sexton) voluntarily raised the question of how he could pass-off certain projects that only he had worked on and understood.[225]

---

[221] Pre-Trial Stipulation ¶ 44; TT 523:19–524:2 (Edward Lee); *see also* TT 380:3–384:12 (Andrades).

[222] *See* JX0455 at 1; TT 638:18–639:19 (Wasinger).

[223] TT 396:13–398:20 (Sarma).

[224] *See* TT 396:13–398:20 (Sarma); TT 381:19–383:11 (Andrades).

[225] TT 381:19–383:11 (Andrades); TT 396:24–398:3 (Sarma).

Defendants argue that once all Key Holders had been terminated the Director-Designation Right fell away pursuant to the Designation Condition in Section 10.2(b). Then, later that same day, Zenith executed a written consent (the "December Consent") pursuant to its purported rights under Sections 10.2(c) and 10.3(a)(ii) of the Stockholders' Agreement to remove the Common Directors from the Board.[226] The disputed effect of the December Consent gave rise to the present litigation. Defendants argue that the December Consent validly removed Chordia and the other Common Directors from the Board. Plaintiffs argue the December Consent was not valid. No party disputes that the Stockholders' Agreement is still in effect and no party has argued that, since December 16, 2022, LGE, Zenith, or Alphonso have acted to terminate the Stockholders' Agreement.[227] Accordingly, as things stand, all Liquidity Rights remain in effect.

## F. Procedural History

These events led Plaintiffs to file the complaint in this action on March 30, 2023. The complaint set forth two counts. These claims were bifurcated for separate resolution.[228] This action deals with Count I, in which Plaintiffs seek an order, pursuant to 8 *Del. C.* § 225, that the December Consent is invalid and that the Common Directors prior to D-Day remain members of the Board.

---

[226] JX0563 2–3.

[227] On April 21, 2023, I granted a Status Quo Order prohibiting Defendants from terminating or amending the Stockholders' Agreement during the pendency of this action. *See* Dkt. 29 Status Quo Order.

[228] Pre-Trial Stipulation ¶ 1.

The parties' litigated this matter at an arguably leisurely pace, at least relative to other actions brought pursuant to 8 *Del. C.* § 225. Trial was held on September 20 and 21, 2023, and, following briefing, post-trial argument was held on December 5, 2023.

## II.     LEGAL ANALYSIS

Plaintiffs seek a determination of the Board's proper composition pursuant to 8 *Del. C.* § 225. The primary dispute here is whether the December Consent is valid. I conclude that it is not.

Alphonso agreed to be bound by the "reasonable efforts" obligation in Section 12.1. Alphonso acted through Sexton when, as interim CEO and at LGE's request, he terminated Andrades and Sarma. Alphonso failed to comply with its obligation arising under Section 12.1, and thus, Sexton's acts caused Alphonso to breach the Stockholders' Agreement. Generally, when a promisor's non-performance of a contractual duty materially contributes to the non-occurrence of a condition, the condition is excused. Although the December Consent's validity is predicated on no Key Holder serving as an Alphonso employee or officer, Alphonso's non-performance of its duty under Section 12.1 caused the non-occurrence of the condition. This non-performance compels me to find Alphonso's breach to excuse the Designation Condition. Accordingly, the December Consent is invalid.

I begin by noting that it is proper for the Court to consider this issue in a Section 225 action.

"The purpose of a Section 225 action 'is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized

46

by controversies about whether a given officer or director is properly holding office.'"[229]

But the scope of a Section 225 action is narrow and is "limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer."[230]

> That notwithstanding,

> Delaware courts reject the notion that "rigid, inflexible rules preclude this court from hearing anything but the narrowest arguments in Section 225 cases." Instead, "the question [of] whether an issue is properly litigable in a Section 225 action turns . . . upon a determination of whether it is necessary to decide in order to determine the validity of the election or designation by which the defendant claims to hold office."[231]

Thus, it is appropriate to consider whether the removal of a director was invalid as a result of some "breach of contract" but only for the "limited purpose of determining the corporation's *de jure* directors and officers."[232]

In a Section 225 action, "[t]he . . . plaintiff, bears the burden of proving by a preponderance of the evidence that it is entitled to relief."[233] When considering a plaintiff's claims, "the relative weight given to any particular piece of evidence, and particularly

---

[229] *Genger v. TR Inv'rs., LLC*, 26 A.3d 180, 199 (Del. 2011).

[230] *Id.*; *see also Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 453 (Del. Ch. 2012); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 909[b], at 9-214 (2022).

[231] *Brown v. Kellar*, 2018 WL 6721263, at *6 (Del. Ch. Dec. 21, 2018) (alteration and omission in original) (footnote omitted).

[232] *Id.* at *5 (Del. Ch. Dec. 21, 2018) (quoting *Genger*, 26 A.3d at 200).

[233] *Swift*, 59 A.3d at 453 (internal quotation marks omitted); *see also* Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 225.03 (7th ed. 2021) ("[A] party challenging the validity of a vote carries the burden in a section 225 action.").

witness testimony, is a matter for the court to determine as the trier of fact."[234] Thus, I find it proper to address the arguments Plaintiffs raise to determine the Board's proper composition. My analysis begins and ends with the "reasonable efforts" provision in the Stockholders' Agreement.

This case turns on a simple breach of contract. "When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract."[235] But "[s]uch public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."[236]

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting

[234] *Swift*, 59 A.3d at 453.

[235] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 n.60 (Del. Ch. July 11, 2011) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006)).

[236] *Id.*; *see also Snow Phipps Grp., LLC v. Kcake Acq., Inc.*, 2021 WL 1714202, at *51 n.566 (Del. Ch. Apr. 30, 2021) ("Delaware courts do not lightly trump the freedom to contract and, in the absence of some countervailing public policy interest, courts should respect the parties' bargain.") (quoting *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006)).

damage to the plaintiff."[237] "When determining the scope of a contractual obligation and measuring the parties' conduct against that obligation to determine breach, 'the role of a court is to effectuate the parties' intent.'"[238] Thus, "[a]bsent ambiguity, the court 'will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'"[239] That is, "[u]nless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[240] This comports with the notion that a "contract's construction should be that which would be understood by an objective, reasonable third party."[241]

Here, Plaintiffs argue that Defendants breached Section 12.1 of the Stockholders' Agreement. Section 12.1 provides:

> The Corporation [("Alphonso")] agrees to use its *reasonable efforts*, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the Parties enjoy the benefits of this Agreement. Such actions include, without limitation, the use of the

[237] *VH5 Cap., LLC v. Rabe*, 2023 WL 4305827, at *13 (Del. Ch. June 30, 2023) (quoting *H–M Wexford, LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).

[238] *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *90 (Del. Ch. Aug. 31, 2020), *aff'd sub nom. Cigna Corp. v. Anthem, Inc.*, 251 A.3d 1015 (Del. 2021); *see also Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

[239] *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *90.

[240] *Id.*

[241] *Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 2771509, at *17 (Del. Ch. Apr. 4, 2023) (quoting *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014)).

Corporation's *reasonable efforts* to cause the nomination and election of the directors as provided in this Agreement.[242]

Plaintiffs argue that Defendants breached the obligation imposed by this "efforts clause" by "pursu[ing] Wall-E for the express purpose of *eliminating [the Key Holders']* *rights*."[243] Given this decision's focus on Defendants' specific argument in response, I set it out below (omitting citations for ease of reading) rather than simply summarizing it:

> [Plaintiffs'] argument fails on two grounds. First, Section 12.1 imposes obligations only on "the Corporation," which the contract defines as "Alphonso Inc." It imposes no obligation on the board or LG/Zenith—both of which are themselves individually defined under the contract. The Stockholders' Agreement takes care to specify the precise persons or entities to whom each of its provisions applies. Some provisions even assign different roles to "the Corporation" and "the Board" within the same sentence.
>
> The obligations imposed on the "Corporation" by Section 12.1 therefore do not apply to the "Board" or to "LGE," because where a contract specifically imposes duties on one defined entity and does not name another, there is a "negative implication" that the exclusion was "intentional." Plaintiffs, however, have sued only the Alphonso board and LG. They cannot have breached Section 12.1 because that section does not apply to them, and the conduct plaintiffs complain of was undertaken solely by or at the direction of the board and LG/Zenith.[244]
>
> Moreover, to the extent Section 12.1 is implicated here at all, the evidence shows that Alphonso complied with it. Plaintiffs omit from their discussion the key limiting language at the end of the provision, which confines the Corporation's "reasonable efforts" obligation "to caus[ing] the nomination

---

[242] JX0050 (emphases added).

[243] Dkt. 182 Plaintiffs' Post-Trial Opening Br. ("Plaintiffs' Post-Trial Opening Br.") at 42.

[244] Defendants include the following footnote: "Alphonso is named as a nominal defendant only for purposes of the derivative claim in Count II, which is not being tried now." Defendants' Post-Trial Answering Br. at 38 n.161.

and election of the directors *as provided in this Agreement*." Alphonso's role was to use reasonable efforts to ensure all "the rights granted under [the] Agreement." Those "rights" included the board's exclusive and unfettered right to terminate the Key Holders. They also included Zenith's right to remove the Common Directors if no Key Holder is employed at Alphonso. The board and Zenith each exercised their "rights granted under [the] Agreement," resulting (as the contract permitted) in no remaining Key Holder employees. Because the Stockholders' Agreement provided for "the nomination and election of the [Common] directors," only for so long as Key Holders remained employed at Alphonso, the reasonable-efforts obligation necessarily fell away as to the nomination of directors once the Key Holders had been terminated.

Plaintiffs' contrary view seems to assume that the "reasonable efforts" provision required the parties to refrain from contractually permitted actions that altered the parties' contractual rights—and that the parties remained bound to use efforts to maintain contractual rights even after the contract no longer required them. Neither proposition makes sense, and neither is supported in the cases.[245]

Four questions guide my analysis of Plaintiffs' breach of contract argument arising from Section 12.1. The Court must determine (1) which parties are required to use reasonable efforts, (2) toward whom reasonable efforts must be used, (3) the scope of the obligation imposed by the words "reasonable efforts," and (4) whether the party that must use reasonable efforts acted in the manner required by the obligation toward those to whom reasonable efforts must be used.

---

[245] Defendants' Post-Trial Answering Br. at 37–40.

51

### A. Alphonso Was Obligated By Section 12.1's "Efforts Clause"

Defendants' first argument is that Section 12.1 imposes an obligation only on Alphonso, but not on Alphonso's Board.[246] In ordinary circumstances, I might have some reservations about this argument.[247] It is a truism that a corporation acts through individuals, as I discuss further below. In support of their argument, however, Defendants point out that the Stockholders' Agreement itself distinguishes in various instances between Alphonso and the Board.[248] In some instances the Stockholders' Agreement refers separately to the Board and Alphonso in the same provision.[249] For purposes of resolving this matter, then, I have determined to apply Defendants' requested approach and,

---

[246] In the course of three sentences and a footnote, Defendants attempt to skirt further examination of Alphonso's actions by asserting that its breach is beyond the ken of this summary proceeding. Not so. In the very next paragraph, Defendants go on to argue that "Alphonso complied with" Section 12.1. *Id.* Indeed, breach of the efforts clause is Plaintiffs' *lead* argument for the December Consent's invalidity. And, for purposes of resolving this dispute, I am accepting *Defendants'* argument that I should distinguish between Alphonso and its board of directors for purposes of analyzing the breach. The parties briefed the matter, and two of the nine witnesses at trial (Andrades and Sarma) testified about their terminations by Alphonso. This is a special summary proceeding to determine the Board's proper composition, not a proceeding to determine damages or other remedies. Defendants' suggestion that I cannot consider defendant Sexton's actions and nominal defendant Alphonso's resulting breach of the efforts clause is perhaps understandable given the nature of Sexton's conduct. It is also, however, an unduly restricted view of this special summary proceeding, particularly in light of the arguments and evidence presented at trial.

[247] *See* Dkt. 200 Plaintiffs' Post-Trial Reply Br. ("Plaintiffs' Post-Trial Reply Br.") at 10 n.9.

[248] *See* Defendants' Post-Trial Answering Br. at 37–38.

[249] *Id.*

accordingly, analyze Section 12.1's efforts clause as imposing a "reasonable efforts" obligation on Alphonso but not the Board.

Unbound by the obligation in Section 12.1, the Board was then free to exercise its express and "exclusive right" to terminate the "executive officers," and employees compensated $500,000 or more per year, as provided in Section 10.5(c).[250] The Board did just that. It exercised this bargained-for contract right on December 16, 2022, when it terminated the five executive-officer Key Holders and when it appointed Sexton as interim CEO.[251]

---

[250] *See* JX0050. Section 10.5(c) provides in relevant part:

Subject to any additional approvals required by law, the Restated Certificate, or pursuant to Section 10.5(d), the Stockholders agree that the Board of Directors shall have the exclusive right to, upon approval at a meeting of the Board of Directors, (i) hire or employ, terminate employment, appoint position and determine the compensation and benefits of executive officers of the Corporation and any employee of the Corporation who receives an annual compensation (inclusive of salary, benefits and other compensation, including stock options and stock awards) equal to $500,000 or more[.]

*Id.*

[251] The preponderance of the evidence supports the conclusion that the parties contemplated LGE's exercise of control as including the unilateral termination of Alphonso's C-level officers. But even LGE characterized this exercise as reflecting an outer limit—a "nuclear option"—that would only be triggered in very specific circumstances. JX0023 at 4 (November 2020 email from Hahm to Beotra: "You mention that we could fire the C-level officers and replace them with LGE staff, but we both know this is only a nuclear option that we have no incentive to do, unless you are running the company into the ground and destroying value, which you also have no incentive to do.").

53

Within this framework, if Plaintiffs are going to demonstrate a breach of the Stockholders' Agreement's express terms, it must arise from Alphonso's breach of Section 12.1. Plaintiffs demonstrate just such a breach. While Alphonso is subject to the clear burden provided in Section 12.1, it is also a corporation. As a corporation, "lack[ing] . . . body and mind," Alphonso "only can act through human agents."[252] In this case, Alphonso acted through Sexton. Following his appointment as interim CEO, Sexton could well be seen as Alphonso's primary actor on D-Day. At LGE's and the LG-Affiliated Directors' behest, Sexton acted for Alphonso and as CEO when he terminated Key Holder employees Andrades and Sarma.[253]

---

[252] *In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d 1257, 1261 (Del. Ch. 2015). Separately, the acts of an agent may be imputed to a corporation. Thus, in the context of the present dispute, this imputation provides an alternative analytical approach. It leads to the same conclusion as the notion that Alphonso acted through Sexton. That is, Alphonso is liable for Sexton's acts. *ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *10 n.100 (Del. Ch. July 31, 2018) ("For multitudinous purposes the knowledge and actions of a corporation's human decision-makers and agents may be imputed to it.") (quoting *In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d at 1262.); *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch. 2015) ("A basic tenet of corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." Delaware courts follow the "general rule of imputation" and "hold[] a corporation liable for the acts and knowledge of its agents."), *aff'd*, 126 A.3d 1115 (Del. 2015).

[253] Defendants argue that the Board is not bound by Section 12.1 and thus was within its rights to terminate the executive-officer Key Holders. But they do not argue that Sexton did not act for Alphonso when he carried out the terminations or that his acts were not otherwise imputed to Alphonso. *See* Defendants' Post-Trial Answering Br. at 37–40.

Unlike the Board, in acting for Alphonso, Sexton's acts were subject to the obligation contained in Section 12.1. Sexton exercised a power that he believed to be within the scope of the authority held by Alphonso's CEO.[254] But he overlooked the express bargained-for contractual efforts obligation that Alphonso agreed to as a party to the Stockholders' Agreement. Alphonso's contractual undertaking infused Andrades and Sarma's employment status with certain protections since it was a precondition to their rights under the Stockholders' Agreement.[255]

Alphonso acted through Sexton when he terminated Andrades and Samra for LGE's purpose of depriving them of their bargained-for and protected contract rights—contract rights that Alphonso was obligated to use "reasonable efforts" to "ensure" their enjoyment of.

## B. Alphonso Owed Andrades And Sarma The Use Of Its "Reasonable Efforts"

The obligation imposed on Alphonso in Section 12.1 required it to use reasonable efforts "to ensure that the rights granted under this Agreement are effective and that the Parties enjoy the benefits of this Agreement."[256]

---

[254] JX0640 123:3–14 (Sexton).

[255] This was particularly true on D-Day since, at the time Sexton fired Andrades and Sarma, the Board had already terminated all other Key Holders. This meant that Andrades and Sarma's continued employment was all that stood between their Director-Designation Right and the failure of the Designation Condition.

[256] JX0050.

As explained above, the express terms of the Stockholders' Agreement permitted the Board to terminate the executive-officer Key Holders.[257] But that right had limits. Defendants overlook these limits. Instead, they make the brazen assertion that the Board has an "exclusive and unfettered right to terminate the Key Holders."[258] Next, Defendants suggest that by combining the Board's termination right with Zenith's director removal right their respective actions "result[ed] (as the contract permitted) in no remaining Key Holder employees."[259]

This argument is wrong. The lynchpin of Defendants' entire argument on this point is that the Board had a contractual right to terminate "the Key Holders." This mischaracterizes Section 10.5(c). Section 10.5(c) provides the Board with the "exclusive right" to terminate "executive officers" and employees whose annual compensation is $500,000 or more.[260] This distinction is the difference between the Board being able to terminate all Key Holders and its ability to terminate only a select group of them. As LGE's own internal D-Day documents demonstrate, Andrades and Sarma fit neither category—they were not subject to termination by the Board under Section 10.5(c).[261] This is why the Board appointed Sexton as interim CEO. Section 10.5(c) did not provide the

---

[257] *See id.* § 10.5(c).

[258] Defendants' Post-Trial Answering Br. at 39.

[259] *Id.*

[260] JX0050.

[261] *See* JX0487 at 53; JX0402 at 19.

56

Board with the "power"[262] to "fire the non-executive key holders."[263]  Hence the "[n]eed"

for the "new CEO's cooperation."[264]

As Key Holders, the Stockholders' Agreement granted Andrades and Sarma express

personal rights to designate directors so long as the Key Holders retained a certain

percentage of Alphonso's outstanding Capital Stock.[265]  Section 10.2(b) provides in its

entirety:

> (i) Three (3) members of the Board shall be designated by the Employee Key
> Holder Majority (the "Common Directors") during such time as Key Holders
> hold at least twenty percent (20%) of the outstanding shares of Capital Stock;
> (ii) two (2) members of the Board shall be designated by the Employee Key
> Holder Majority during such time as Key Holders hold at least fifteen percent
> (15%) of the outstanding shares of Capital Stock and (iii) one ( 1) member
> of the Board shall be designated by the Employee Key Holder Majority
> during such time as Key Holders hold at least ten percent (10%) of the
> outstanding shares of Capital Stock.  For the avoidance of doubt, this director
> designation right by the Employee Key Holder Majority under this
> Subsection 10.2(b) shall be null and void if no Key Holder serves as an
> officer or employee of the Corporation at such time[.][266]

This provision grants a right.  Indeed, the Designation Condition itself refers to the

preceding sentence as the "director designation *right*[.]"[267]

---

[262] JX0487 at 53.

[263] JX0402 at 19.

[264] *Id.*

[265] *See* JX0050 § 10.2(b).

[266] JX0050.

[267] *Id.* (emphasis added).

57

But the first sentence of Section 10.2(b) does not confer some broad or general right. It grants a personal right—a right that is capable of being held even by a single Key Holder. By its plain and unambiguous terms, there are two requirements to a Key Holder exercising the Director-Designation Right. First, all existing Key Holders must together hold the requisite percentage of Alphonso's outstanding stock. At a minimum, this requires cumulative holdings of 10% of Alphonso's outstanding Capital Stock.[268] Second, at least one Key Holder must be an Alphonso officer or employee. If only one Key Holder is an Alphonso officer or employee, then that sole Key Holder would necessarily make up the "Employee Key Holder Majority."[269] This means the sole Key Holder serving as an Alphonso employee or officer individually would hold the entire designation right and can decide whom to designate without any input from the other Key Holders.

Consider how this played out in the minutes before Sexton terminated Andrades and Sarma on D-Day. LGE's internal documents on Project Wall-E demonstrate that D-Day was a carefully sequenced operation.[270] First, the Board, acting pursuant to its express bargained-for contractual right in Section 10.5(c) and not bound by the obligations arising from Section 12.1, terminated the executive-officer Key Holders at the Board meeting. At

---

[268] *Id.* § 10.2(b).

[269] JX0050 § 6.2 (defining the Employee Key Holder Majority as "the Key Holders who are directors, officers or employees of the Corporation at such time ('the Employee Key Holders') holding a majority of the shares of Capital Stock then held by all Employee Key Holders").

[270] *See, e.g.*, JX0487 at 53 (D-Day Schedule).

the same time, the Board also appointed Sexton as interim CEO.[271]  Immediately following the terminations, the majority holder of Alphonso's Capital Stock then held by Andrades and Sarma constituted the entirety of the Employee Key Holder Majority.[272]  Andrades and Sarma—and only Andrades and Sarma—held the right to designate all Common Directors. At this point—after the Board terminated the executive-officer Key Holders but before Sexton terminated Andrades and Sarma—Alphonso or Sexton could have asked Andrades and/or Sarma to designate new Common Directors.[273]  We can never know what their answer would have been because Andrades and Sarma were denied even this basic and reasonable courtesy.[274]

Defendants' arguments further compel the conclusion that the Stockholders' Agreement granted Andrades and Sarma a right that Alphonso was required to exercise reasonable efforts to "ensure" their enjoyment of.  Defendants' briefing modifies the text of the second sentence of Section 12.1 to refer specifically to Common Directors—*i.e.*, the directors identified in Section 10.2(b)—writing that "the Stockholders' Agreement

---

[271] *See id.*

[272] At this time, the Key Holders' collective holdings still exceeded the thresholds required by Section 10.2(b), which satisfied the first requirement.  *See* Pre-Trial Stipulation ¶ 33.  Andrades and Sarma satisfied the second requirement because they had not yet been terminated and, were at that time, Alphonso employees.

[273] *See* TT 632:7–12 (Wasinger).

[274] *See* TT 632:7–12 (Wasinger).

provided for 'the nomination and election of the [Common] directors[.]'"[275]  Defendants'

omit, however, the first half of Section 12.1's second sentence, which provides that "[s]uch

actions include, without limitation . . . ."[276]  Section 12.1's first sentence thus includes the

obligation identified in the second sentence, which Defendants interpret as unequivocally

referring to the Common Directors.[277]  But, by its own terms, the second sentence of

Section 12.1 does not limit Alphonso's obligations under the first sentence to solely the

"nomination and election" of Common Directors.  Instead, it expressly imposes a broader

obligation on Alphonso to ensure that the "rights" (plural) granted under the Stockholders'

Agreement are effective.[278]

Building off the foregoing and in this context, Section 12.1 obligated Alphonso to

use reasonable efforts to ensure the rights "granted under this Agreement" are effective as

---

[275] Defendants' Post-Trial Answering Br. at 39 (citing JX0050 § 12.1) (first alteration in original).  *But see* Dkt. 205 Transcript of 12-5-2023 Post-Trial Oral Argument ("Post-Trial Oral Argument Tr.") 131:9–15 ("[DEFENDANTS' COUNSEL]: Well, we haven't seen that contention from the other side, as the Court[] just noted.  And I think that's because [the second sentence of Section 12.1] doesn't really apply.  It goes, we would argue, to nomination and election.  We aren't dealing with directors who are nominated or elected.  We're dealing with a designation right.").

[276] JX0050.

[277] *See Include*, BLACK'S LAW DICTIONARY (11th ed. 2019) [hereinafter BLACK'S LAW] (defining "include" as "[t]o contain as part of something. . . . [S]ome drafters use phrases such as *including without limitation* and *including but not limited to*—which mean the same thing [as including]") (emphases in original); *see generally*, KENNETH A. ADAMS, A MANUAL OF STYLE FOR CONTRACT DRAFTING 356 (4th ed. 2017); J. Travis Laster & Kenneth A. Adams, *When Contracts Seek To Preempt Judicial Discretion*, 101 JUDICATURE 32, 35 (2017).

[278] *See* JX0050 § 12.1.

to those Key Holders whose employment it controlled (*i.e.*, Andrades and Sarma's employment). Put another way, Andrades and Sarma struck a heartier deal than the other Key Holders. The executive-officer Key Holders' rights to designate directors were subject to a condition the Board could trigger at any time and pursuant to its own express contractual right to do so. Accepting Defendants' argument regarding the proper construction of Section 12.1, the Board owed no obligation to those Key Holders under Section 12.1. By contrast, only Alphonso could terminate Andrades and Sarma's employment and thus cause the failure of the Designation Condition on which their right to designate directors was predicated. And, accepting Defendants' construction of Section 12.1, Alphonso had an obligation under Section 12.1 to use its "reasonable efforts" to "ensure" the rights granted in the Stockholders' Agreement were effective, with the plain text of the Stockholders' Agreement and Defendants' own arguments compelling the conclusion that such rights included Andrades and Sarma's Director-Designation Right.

In one of Defendants' primary arguments on this issue, they assert that the reasonable efforts obligation fell away once Alphonso and the Board had terminated all of the Key Holders.[279] But Defendants miss the point entirely—Alphonso had an obligation to use "reasonable efforts" to "ensure" the "effective[ness]" of Andrades and Sarma's rights in the first place, irrespective of whether that right could, *after* the use of reasonable efforts, be effectively terminated by firing them as a result of the Designation Condition.

---

[279] Defendants' Post-Trial Answering Br. at 39.

61

Indeed, such an argument would require me to conclude that Alphonso's "reasonable efforts" obligation under Section 12.1 only commenced after Alphonso terminated Andrades and Sarma, which is contrary to the plain text of Section 12.1.

## C. Alphonso's Reasonable Efforts Obligation

Although this analysis has already included considerable discussion of efforts clauses, it is time to give actual meaning to the words "reasonable efforts."

### 1. Definition: Adding Color

As noted previously, the "reasonable efforts" language in Section 12.1 is "known as an 'efforts' clause."[280] "Efforts clauses generally replace 'the rule of strict liability for contractual non-performance that otherwise governs' with 'obligations to take all reasonable steps to solve problems and consummate the' contractual promise."[281] There are a variety of these "clauses."[282] But in Delaware, courts interpret them as having the same general meaning.[283] "[W]here the parties fail[] to contractually set [a meaning for

---

[280] *Menn v. ConMed Corp.*, 2022 WL 2387802, at 34 (Del. Ch. June 30, 2022) (referring to "commercially reasonable efforts"); *see also Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *86–87 (Del. Ch. Oct. 1, 2018) (identifying "reasonable efforts" as an efforts clause), *aff'd*, 198 A.3d 724 (Del. 2018).

[281] *ConMed*, 2022 WL 2387802 at *34.

[282] *See Akorn, Inc.*, 2018 WL 4719347, at *86–88 (discussing the meaning of the various efforts clauses, *i.e.*, "reasonable best efforts," "reasonable efforts," and "commercially reasonable efforts").

[283] *Id.* at *87; *see also ConMed*, 2022 WL 2387802 at *35 ("Although deal practitioners have some sense of the hierarchy among efforts clauses, courts applying the standards have struggled to discern daylight between them." "This decision, therefore, interprets 'commercially best efforts' as imparting the same meaning as 'best efforts.'"); *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *15 n.128 (Del. Ch. Feb. 27,

the efforts clause,]" Delaware courts ascribe a default meaning.[284]  Such "provisions place[]

an affirmative obligation on the parties to take all reasonable steps."[285]

---

2020) ("[T]here is no basis for suggesting that reasonable efforts should be given a meaning different from best efforts or reasonable best efforts.  Most courts use the terms best efforts and reasonable efforts interchangeably.") (quoting Kenneth A. Adams, *Understanding "Best Efforts" and Its Variants (Including Drafting Recommendations)*, 50 PRAC. L. 11, 14 (2004)); 2 Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 13.06, at 13-46 n.7 (2023 ed.) (compiling cases that use "reasonable efforts," "reasonable best efforts," and "commercially reasonable efforts" and explaining that these standards are "often, without comment, used . . . somewhat interchangeably with 'best efforts'"); 2 *Farnsworth on Contracts* § 7.17c, at 405 n.13 (3d ed. 2004).

[284] *Neurvana Med.*, 2020 WL 949917, at *15; *see also ConMed*, 2022 WL 2387802, at *34 (explaining that *Neurvana Med.*, 2020 WL 949917 and *Himawan v. Cephalon, Inc.*, 2018 WL 6822708 (Del. Ch. Dec. 28, 2018) both include a contractual definition of the obligation the efforts clause imposes and "are thus of little help").

[285] *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017); *see also ConMed*, 2022 WL 2387802 at *34 (interpreting efforts clause as requiring "all reasonable steps"); *Williams Field Servs. Grp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350, at *34 (Del. Ch. Sept. 25, 2019) ("More generally, an obligation to take reasonable actions or use commercially reasonable efforts obligates a party 'to take all reasonable steps to solve problems and consummate the transaction' on the terms set forth in the governing agreement.").  Irrespective of whether Delaware courts would treat the various efforts clauses interchangeably, Delaware case law supports the conclusion that the "reasonable efforts" provision contained in Section 12.1 of the Stockholders' Agreement, should be interpreted as requiring "all reasonable steps."  *Compare* ABA MERGERS AND ACQUISITIONS COMMITTEE, MODEL STOCK PURCHASE AGREEMENT WITH COMMENTARY 212 (2d ed. 2010) (identifying a deal practitioner ascribed hierarchy of efforts clauses as placing "reasonable efforts" below "reasonable best efforts" and above "commercially reasonable efforts"), *and Akorn, Inc.*, 2018 WL 4719347, at *87–88 (quoting same), *with Akorn, Inc.*, 2018 WL 4719347, at *87–88 (interpreting a "commercially reasonable efforts" clause and a "reasonable best efforts" clause as each requiring that the obligor "take all reasonable steps" based on the high court's interpretation in a similar context: "Referring to [two different efforts clauses], the high court stated that 'covenants like the ones involved here impose obligations to take all reasonable steps to

As applied here, Section 12.1 requires Alphonso to take "all reasonable steps" "to ensure that the rights granted under this Agreement are effective and that the Parties enjoy the benefits of this Agreement."[286] No party has argued that there is ambiguity about what these words mean. Nonetheless, it is appropriate to take a deeper dive into the meaning of these words as they are used in this context as "[t]his Court often looks to dictionaries to ascertain a term's plain meaning."[287] Here, the terms "ensure," "effective," "enjoy," and "benefits" are relevant.

"Ensure" means:

- *Merriam-Webster Dictionary*: To "guarantee."[288]
- *American Heritage Dictionary*: "To make sure or certain[.]"[289]

---

solve problems and consummate the transaction.'") (quoting *Williams Companies, Inc.*, 159 A.3d at 272).

[286] JX0050. Section 12.1 also includes language that limits the "reasonable efforts" obligation to those actions which fall "within the requirements of applicable law." I interpret this unambiguous language to mean that the efforts requirement is specifically bounded by what is lawful to do. In other words, the efforts clause does not require Alphonso to carry out any acts that would have the effect of breaking the law. This language is designed to be a ceiling—used to define the outer limits of the obligation—not a floor. *Compare id.* § 12.1, *with* ADAMS, *supra* note 277, at 431.

[287] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020); *Thermo Fisher Sci. PSG Corp.*, 2023 WL 2771509, at *17 ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.") (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)).

[288] *Ensure*, The MERRIAM-WEBSTER DICTIONARY (2022) [hereinafter MERRIAM-WEBSTER].

[289] *Ensure*, AM. HERITAGE COLLEGE DICTIONARY (3d ed. 1993) [hereinafter AM. HERITAGE].

- *Oxford American Dictionary*: To "make certain that (something) shall occur or be the case[.]"[290]

"Effective" means:

- *Black's Law Dictionary*: "[I]n operation at a given time[,]" and "[p]roductive; achieving a result[.]"[291]
- *Merriam-Webster Dictionary*: "[P]roducing a decisive or desired effect[,]" "being in effect[,]" and "ready for service or action."[292]
- *American Heritage Dictionary*: "Having an intended or expected effect[,]" "[o]perative; in effect[,]" "[e]xisting in fact; actual[,]" and "[p]repared for use or action[.]"[293]
- *Oxford American Dictionary*: "[S]uccessful in producing a desired or intended result" or "operative[.]"[294]

"Enjoy" means:

- *Black's Law Dictionary*: "To have, possess, and use (something) with satisfaction; to occupy or have the benefit of (property)."[295]
- *Merriam-Webster Dictionary*: "[T]o have for one's benefit or use."[296]
- *American Heritage Dictionary*: "To have the use or benefit of[.]"[297]
- *Oxford American Dictionary*: To "possess and benefit from[.]"[298]

---

[290] *Ensure*, NEW OXFORD AM. DICTIONARY (3d ed. 2010) [hereinafter OXFORD AM.].

[291] *Effective*, BLACK'S LAW.

[292] *Effective*, MERRIAM-WEBSTER.

[293] *Effective*, AM. HERITAGE.

[294] *Effective*, OXFORD AM.

[295] *Enjoy*, BLACK'S LAW.

[296] *Enjoy*, MERRIAM-WEBSTER.

[297] *Enjoy*, AM. HERITAGE.

[298] *Enjoy*, OXFORD AM.

"Benefit" means:

- *Black's Law Dictionary*: "The advantage or privilege something gives; the helpful or useful effect something has[,]" and "the profit that moves to the promisee[.]"[299]
- *Merriam-Webster Dictionary*: "[A]dvantage" or a "useful aid[.]"[300]
- *American Heritage Dictionary*: "Something that promotes or enhances well-being; an advantage[,]" or a "[h]elp; aid[.]"[301]
- *Oxford American Dictionary*: "[A]n advantage or profit gained from something[.]"[302]

Together, these definitions add color to the obligation Alphonso undertook when it entered the Stockholders' Agreement. Alphonso undertook the obligation to "take all reasonable steps" to "make certain" Andrades and Sarma's Director-Designation Right granted in Section 10.2(b) is "operative; in effect" and "productive," such that Andrades and Sarma "possess" or "have for [their] . . . use" a right that is "helpful," "useful," and "advantage[ous]."[303] But that is not the end. The picture gets even clearer when considering how Delaware courts have applied the "all reasonable steps" obligation when addressing efforts clauses.

---

[299] *Benefit*, BLACK'S LAW.

[300] *Benefit*, MERRIAM-WEBSTER.

[301] *Benefit*, AM. HERITAGE.

[302] *Benefit*, OXFORD AM.

[303] *Supra* nn.288–302.

66

### 2. Application: Clarity

While the requirement to take "all reasonable steps" does not "mean everything possible under the sun[,]"[304] it does include certain basic requirements. Plaintiffs quote *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.* for the proposition that, at bottom, "[a] party breaches a 'reasonable best efforts' provision when it 'pursue[s] another path designed to avoid' an outcome."[305] And indeed, this is encompassed by the notion that one might even breach an efforts clause by his passive acts which fail to satisfy the affirmative obligation contained in the efforts clause. Prior "decisions of this court have found that a party breached an efforts provision [by] making no effort to sell or market the product [which he was obligated to do under an efforts clause]."[306]

In recent years, Delaware courts have begun to examine two specific factors. To determine "whether a party has breached an efforts clause in a transaction agreement, 'this court has looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty.'"[307]

---

[304] *See Akorn, Inc.*, 2018 WL 4719347, at \*87 (quoting *Alliance Data Sys. Corp. v. Blackstone Cap. P'r V L.P.*, 963 A.2d 746, 763 n.60 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009)).

[305] Plaintiffs' Post-Trial Opening Br. at 43 (citing 965 A.2d 715, 749 (Del. Ch. 2008)).

[306] *ConMed*, 2022 WL 2387802, at \*36 (citing *Pegasystems, Inc. v. Carreker Corp.*, 2001 WL 1192208, at \*9 (Del. Ch. Oct. 3, 2001)).

[307] *Id.* at \*35; *see also Snow Phipps Grp., LLC*, 2021 WL 1714202, at \*42; *Akorn, Inc.*, 2018 WL 4719347, at 91.

In *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, the Delaware Supreme Court recounted the *Hexion* court's observation that when facing solvency concerns, "a reasonable response to such concerns might have been to approach the [seller's] management to discuss the issue and *potential resolutions of it*."[308] And when the solvency concern grew, "the court observed that the buyer 'was then clearly obligated to approach [the seller's] management to discuss the appropriate course to take to mitigate' the solvency concerns."[309]

This interpretation of *Hexion* is broader than the trial court read it to be.[310] The trial court in *Williams* explained that in *Hexion*, a buyer had undertaken an obligation to use "reasonable best efforts" to secure financing.[311] The trial court in *Williams* sought to distinguish *Hexion* on the grounds that in *Hexion* the buyer "actively and affirmatively torpedoed its ability to finance."[312] But in *Williams*, the trial court found there to be an "absence of any evidence to show that [the obligor] caused [the non-occurrence of a

---

[308] 159 A.3d at 272 (alteration in original).

[309] *Id.* (alteration in original).

[310] *Id.*

[311] *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *18 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017).

[312] *Williams Companies, Inc.*, 159 A.3d at 272.

condition necessary for closing]."[313] The high court found this focus improperly narrow because the efforts clauses imposed affirmative obligations, not a negative obligation that can be satisfied merely by not sabotaging a contractual condition. Certainly, "actively torpedo[ing]" a condition is one way to determine that a party has breached an efforts clause, but it is not the only way.[314] The threshold is not so high. Instead, even the failure to take actions a party is contractually obligated to use its efforts to take can give rise to a breach.[315]

### 3. Reasonable Efforts In The Face Of An Express Contract Right

In Defendants' Pretrial Brief, they assert in passing in a single sentence that Section 10.5(c) provides the CEO the right to terminate non-executive-officer employees.[316] Defendants have also argued that a party need not give up its contract rights in the face of a competing obligation arising from an efforts clause.[317] Although Defendants made this

[313] *See id.* at 273; *Williams Companies, Inc.*, 2016 WL 3576682, at *5 ("[T]he Merger Agreement includes a condition to closing that Latham provide ETC and Williams a written opinion" referred to as "the 721 Opinion.").

[314] *Compare Williams Companies, Inc.*, 159 A.3d at 267, 272–273 (finding the trial court's reading of *Hexion* and efforts clauses was not wrong per se and was erroneous only because it was "unduly narrow" since the trial court focused on whether the obligor had acted to cause the non-occurrence of a condition and did not also consider whether it breached by failing to take steps to cause the condition to occur), *with Williams Companies, Inc.*, 2016 WL 3576682, at *5.

[315] *Williams Companies, Inc.*, 159 A.3d at 272–63.

[316] Dkt. 167 Defendants' Pretrial Br. at 40.

[317] The argument Defendants raise suggests the actual harm to such an interpretation is that it would alter the parties' contractual rights by requiring the parties to use reasonable efforts to preserve a right even after the contract no longer required them to. Here, I again

argument as to the Board, one might expect such an argument also to apply to a right that Defendants assert Section 10.5(c) grants the CEO.

I need not reach this issue as to the Board since this analysis assumes Defendants' starting point—that Section 12.1 does not apply to the Board. It is questionable as to whether I even need to address the issue here as to Sexton since Defendants also do not raise this argument as to any perceived right of the CEO to terminate employees.[318] Nonetheless, I address it briefly.

In making their argument as to the Board, Defendants cite *Akorn, Inc. v. Fresenius Kabi AG* for the proposition that efforts clauses "d[o] not require either side of the deal to sacrifice its own contractual rights for the benefit of its counterparty."[319] Defendants' also quote *Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*:

> A party's obligation to use commercially reasonable efforts must be cabined by its bargained-for contractual rights. If an agreement to use commercially reasonable efforts to comply with obligations in a contract means that a party cannot exercise its bargained-for right to terminate that contract, that bargained-for right would be illusory.[320]

---

note that Defendants have the sequence backwards. Alphonso was obligated to use reasonable efforts in the first instance to maintain the right in an effective and operative state. It does not alter the contract. It is quite literally a requirement provided in the contract's express terms.

[318] *See* Defendants' Post-Trial Answering Br. at 37–40.

[319] 2018 WL 4719347, at *91.

[320] 2019 WL 1223026, at *22 (Del. Ch. Mar. 14, 2019) (footnote omitted).

At first glance, these passages might seem supportive of Defendants' argument. Closer examination, however, shows this not to be so. In *Akorn* and *Vintage Rodeo*, the Court's concern was whether a party's contract rights are rendered illusory.[321] It is, of course, the most basic of principles that "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[322] "Delaware courts read contracts as a whole, and interpretations that are commercially unreasonable or that produce absurd results must be rejected."[323] When "read[ing] a contract as a whole . . . we will give each provision and term effect, so as not to render any part of the contract mere surplusage."[324] This means

---

[321] The Court in the cited cases focuses on the effectiveness of contract termination rights. Such rights can presumably only be used one time. Thus, by saying that the right cannot be used, one would in effect be rejecting the only use the right provides—to terminate. This is why preventing the exercise of the right would mean to "sacrifice" the right in a manner that would render it, in effect, illusory.

[322] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[323] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1211 (Del. 2021); *see also Merck & Co. v. Bayer AG*, 2023 WL 2751590, at *6 (Del. Ch. Apr. 3, 2023) (quoting *Manti Hldgs., LLC*, 261 A.3d at 1211), *aff'd*, 2023 WL 7777218 (Del. Nov. 16, 2023); *IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*, 2017 WL 4082886, at *4 (Del. Ch. Sept. 7, 2017) (stating that the Court's "task is to construe the contract according to the plain meaning of its terms, remaining mindful that [its] construction of each term must make sense when considering the contract as a whole").

[324] *Osborn*, 991 A.2d at 1159.

71

that "[w]e will not read a contract to render a provision or term 'meaningless or illusory.'"[325]

Neither Zenith nor Alphonso, however, hold any express right to terminate the Director-Designation Right. Indeed, Section 10.2(b) sets forth no right at all for LGE or Alphonso. Instead, it references a condition on the Director-Designation Right.[326] Elsewhere, I note that Section 10.5(c) of the Stockholders' Agreement addresses the right of the CEO to "implement and effect" the "termination of employment" of "non-executive officer employees of the Corporation in accordance with [a] human resources and labor policy[.]"[327] That is fine as far as it goes, but it is a basic tenet of contract law that I must give meaning to contracts by interpreting them as a whole.[328] Section 12.1 imposes a frankly small obligation on Alphonso, and that limited obligation, which Alphonso voluntarily undertook, can hardly be said to have rendered the right to terminate employees "illusory." Indeed, the CEO could terminate *any* Alphonso employee. Only when seeking to terminate Andrades and/or Sarma, however, was the CEO required to use reasonable efforts first under Section 12.1.

---

[325] *Id.*

[326] Although I need not consider any evidence beyond the plain text of the agreement here, I nonetheless note that the record suggests the Designation Condition was inserted to serve an entirely different purpose than the one Defendants now assert. *See supra* n.48.

[327] JX0050.

[328] *Osborn*, 991 A.2d at 1159.

Although tempering the CEO's employee termination "right" comes nowhere near rendering the "right" ineffective or illusory, the same cannot be said for Defendants' reading of Plaintiffs' rights under the Stockholders' Agreement. Defendants seek to read the Director-Designation Right as, in essence, an illusory right. Or, at least, a right that LGE and Alphonso could terminate at their election.[329] But that is not what the parties bargained for.[330]

The Stockholders' Agreement's plain terms also belie Defendants' reading. In applying Section 12.1 to temper the CEO's use of his termination "right," I must read the contract as a whole. Perhaps the CEO did hold some express employee termination right conferred by Section 10.5(c). Even were it so, Alphonso agreed to be bound by a specific standard of conduct regarding the treatment of Andrades and Sarma's Director-Designation Right. Defendants' own argument reads the second sentence of Section 12.1 as referring to rights related to the Common Directors, the effectiveness of which necessarily requires the operational existence of the Director-Designation Right.[331] Reading the Stockholders'

---

[329] Defendants' reading also would appear to render the entire Stockholders' Agreement terminable at LGE's option. *Compare* JX0050 § 13.8, *and* JX0050 § 13.1, *with* JX0050 § 10.2(b). *See infra* nn.361–62.

[330] It is also appropriate to consider commercial reasonableness and a document's logic when interpreting a contract. *See Osborn*, 991 A.2d at 1159, 1160-61 (addressing request "to interpret the contract, contrary to both the plain meaning of the document and logic, and to reach an absurd, unfounded result"); *Manti Hldgs., LLC*, 261 A.3d at 1211; *Merck & Co.*, 2023 WL 2751590, at *6; *IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*, 2017 WL 4082886, at *4.

[331] Defendants modify the text of that sentence to make this point: "[T]he Stockholders' Agreement provided for 'the nomination and election of the [Common]

73

Agreement so as to render no provision surplusage and no rights to be illusory or meaningless requires rejecting Defendants' reading of the Stockholders' Agreement.

Here, unlike in *Akorn, Inc.* and *Vintage Rodeo Parent, LLC*, the CEO's employee termination "right" is not rendered illusory, nor is Alphonso asked to "sacrifice" the contract "right" to terminate employees. Instead, it is Defendants' reading that would render the Director-Designation Right an illusory or meaningless right—a reading which I must reject.[332]

## D. Alphonso Breached Its Obligation To Use "Reasonable Efforts" To Ensure That Andrades And Sarma's Director-Designation Right Remained Effective

As noted above, Sexton acted for Alphonso when he terminated Andrades and Sarma. In so doing, he caused Alphonso to breach its obligation under Section 12.1. In the face of Alphonso's affirmative obligation to take "all reasonable steps," Sexton failed to take any steps toward this obligation. Worse, and much like in *Hexion*, Sexton took steps in the opposite direction.

As noted above, Sexton was brought in as an eleventh-hour substitute for Sareen. Sareen previously agreed to serve as Alphonso's interim CEO but backed out on November

---

directors[.]'" Defendants' Post-Trial Answering Br. at 39 (citing JX0050 § 12.1) (second alteration in original).

[332] *See Osborn*, 991 A.2d at 1159–61; *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'"); *Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *29 n.284 (Del. Ch. Aug. 10, 2020) ("The cardinal rule of contract construction is that, where possible, a court should give effect to all contract provisions.") (quoting *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992)).

30, 2022.[333] Sareen explained to Hyoung-Saeyi Park that "he won't sleep well being a person who stabs their back, and he can't really do this."[334]

On December 1, 2022, LGE "shift[ed] to plan B"—offering Sexton the interim CEO position.[335] After a vetting process that consisted of a one-hour conversation with Wasinger, the job was his.[336] Sexton's role in all of this was simple and, indeed, plainly set forth in LGE's draft offer letter.[337] Sexton's job duties required him to "[r]emove two key holders (Ravi Narayan Sarma and Richard Andrades)."[338] Contrary to Jo's trial testimony that Sexton was a "market industry veteran[] that . . . could help the Alphonso business,"[339] the preponderance of the evidence compels the unfortunate conclusion that LGE executives selected, and the LG-Affiliated Directors appointed, Sexton for the interim CEO role because LGE viewed him as fully tractable.[340]

The record demonstrates that Sexton also had significant personal issues that interfered tremendously with his ability to perform the role of interim CEO. Even on his

---

[333] *See* JX0465 at 2; JX0456.

[334] JX0465 at 2.

[335] *See* JX0458.

[336] TT 643:4–11, 649:14–23 (Wasinger).

[337] *See* JX0445 at 8.

[338] JX0445 at 8; *see also* JX0640 175:10–13 (Sexton).

[339] TT 690:2–691:7 (Jo).

[340] *See, e.g.*, JX0548 at 9 ("dumb and easy to control").

first day (*i.e.*, D-Day), for reasons I need not get into here, Sexton was "unable to speak in meetings and dozed off several times. He was a zombie."[341] And after two days, Sexton was "already a bomb."[342]

The unrefuted contemporaneous evidence demonstrates that the Board appointed Sexton as a warm body to do the dirty work that it could not. Sexton's own testimony at his deposition suggests that he had no basis for terminating Andrades and Sarma other than blindly following the LG-Affiliated Directors' instructions.[343]

The preponderance of the evidence compels the conclusion that Sexton gave little or no regard to Alphonso's obligation to take "all reasonable steps" to ensure that Andrades and Sarma enjoy the benefit of the rights granted to them in the Stockholders' Agreement.[344] Despite being aware of the Stockholders' Agreement, Sexton appears never even to have considered whether Alphonso had obligations to Andrades or Sarma before terminating them. But that does not mean that the obligation was not owed.

When Sexton terminated Andrades and Sarma, he acted for Alphonso to deprive them of their Director-Designation Rights.[345] Acting for Alphonso and as CEO, Sexton

---

[341] JX0594; JX0548 at 6–7.

[342] JX0548 at 7.

[343] JX0640 169:10–16 (Sexton).

[344] *See id.*

[345] It is of no significance that this action was taken based on the Board's direction because Sexton acted for Alphonso in breaching a corporate obligation. Defendants'

76

acted at the LGE-controlled Board's bidding for the benefit of another party under the Stockholders' Agreement (*i.e.*, Zenith/LGE) because they "want[ed] a return on their investment."[346] At a minimum, this thoughtless termination breached Alphonso's contractual obligation under Section 12.1 to "take all reasonable steps" to "make certain" Andrades and Sarma's Director-Designation Right remained "operative; in effect" and "productive," such that Andrades and Sarma "possess" or "have for [their] . . . use" a right that is "helpful," "useful," and "advantage[ous]."[347]

But Alphonso not only failed to take "all reasonable steps," the overwhelming weight of the evidence, and certainly a preponderance, compels the conclusion that Alphonso took *no* steps and made *no* efforts to maintain Andrades and Sarma's bargained-for right. Worse than taking no steps to ensure the right, Alphonso triggered the Designation Condition and deprived them of the right entirely.

In contexts like this, Delaware courts have previously examined two factors to determine whether an efforts clause has been breached.[348] Logic might dictate that where one undertakes an affirmative contractual duty to protect and give effect to a counterparty's

---

arguments make abundantly clear their view that the efforts clause was a separate and independent obligation binding Alphonso specifically.

[346] JX0235.

[347] *Supra* nn.288–302.

[348] *ConMed*, 2022 WL 2387802, at *35 (applying test to efforts clause related to a buyer's post-acquisition obligations under a stock purchase agreement).

right, the failure to take any steps or use any efforts to do so necessarily requires a finding of breach. But I need not leave it to logic.

### 1. Reasonable Grounds

The first factor requires courts to consider "whether the party subject to the [efforts] clause (i) had reasonable grounds to take the action it did."[349] This question is not about whether the Board had a right or justification to terminate the executive officers. The Board was not bound by Section 12.1. Instead, this question is about whether Alphonso had reasonable grounds to terminate Andrades and Sarma. I conclude that it did not. To reach this conclusion, I must consider the action taken and the context in which it was taken.

Here, the action is obvious. Alphonso—owing Andrades and Sarma a specific and affirmative obligation to undertake reasonable efforts to ensure the effectiveness of the Director-Designation Right—terminated them and caused the failure of the Designation Condition. The preponderance of the evidence suggests that Sexton was well aware of the effect the terminations would have on Andrades and Sarma's contractual rights. Starting in May 2022, Jo told Sexton of his plan to take control of Alphonso, "remove [Chordia] from whatever role," and "[b]ring in new upper management."[350] In addition to credible trial testimony regarding Sexton's involvement, Sexton's own deposition is telling.[351]

---

[349] *Id.*; *see also Snow Phipps Grp., LLC*, 2021 WL 1714202, at *42; *Akorn, Inc.*, 2018 WL 4719347, at *91.

[350] JX0253; JX0640 50:3–12 (Sexton).

[351] *See* JX0640.

After accepting the job offer in December 2022, Sexton was "brought under the cloak . . . and told that . . . they were going to remove the top management."[352] Even from the express terms of his offer letter, Sexton understood that he was being brought in to "[m]ake staffing decisions for the company that are not within the exclusive right of the Board."[353] Sexton also understood that he was being asked to terminate Andrades and Sarma—whose employment "was not within the rights of the board, but were within the rights of the CEO."[354] And, the week before D-Day, Sexton met in person with the LGE team at LGE's office.[355] There, the LGE team showed Sexton documents and explained Project Wall-E and the events that would transpire on D-Day.[356]

The preponderance of evidence demonstrates that Sexton understood his role in D-Day, the plan to oust the founders, and that firing Andrades and Sarma was a part of that plan.[357] Sexton was also aware of the Stockholders' Agreement and the Board's deliberation as to whether it would terminate the agreement.[358] But even if Sexton did not

---

[352] *Id.* 82:1–7 (Sexton).

[353] *Id.* 119:4–121:14 (Sexton).

[354] *Id.* 123:3–14 (Sexton).

[355] *Id.* 81:23–84:22 (Sexton).

[356] *Id.*

[357] *See, e.g.*, *id.* 169:10–21 (Sexton).

[358] *Id.* 142:2–4 (Sexton) (Sexton was told about it "[b]ecause [he] was joining as interim CEO").

actually know that terminating the two remaining Key Holders would terminate their Director-Designation Right, Alphonso would be no less responsible for breaching its corporate obligation. As Defendants argue, Alphonso is the party that owed the obligation under Section 12.1.[359]

By terminating Andrades and Sarma, Alphonso picked winners and losers under the Stockholders' Agreement. The terminations triggered the Designation Condition, which terminated their Director-Designation Right. Opposite its obligation under Section 12.1, Alphonso joined the invasion—"actively and affirmatively torpedo[ing]"[360] the right that it explicitly promised to "ensure" the operability of for Andrade and Sarma's benefit. But the damage to Andrades and Sarma's rights does not end there. Without the Director-Designation Right, LGE-controlled actors can unilaterally modify or amend the Stockholders' Agreement to postpone the Key Holders' realization of economic value from their Liquidity Rights.[361] And they can unilaterally terminate the Stockholders' Agreement

---

[359] Defendants' Post-Trial Answering Br. at 37–38.

[360] *Williams Companies, Inc.*, 159 A.3d at 272 (quoting *Williams Companies, Inc.*, 2016 WL 3576682, at *18).

[361] *See* JX0050 §§ 13.8 ("This Agreement may be amended, modified or terminated (other than pursuant to Subsection 13.l above) and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by (a) [Alphonso], (b) the Investor, and (c) the Employee Key Holder Majority (*for the avoidance of doubt, such execution by the Employee Key Holder Majority shall not be required if no Key Holder serves as an officer or employee of [Alphonso] at such time*).") (emphasis added), 1.23 ("'Investor(s)' means the Persons named on Exhibit A hereto, each Person to whom the rights of an Investor are assigned pursuant to Subsection 13.9, each Person who hereafter becomes a

80

at their option.[362]   Alphonso destroyed the rights Andrades and Sarma bargained for and gave LGE rights it had not.

This charts onto the *Williams* Court's description of *Hexion*.  On D-Day, Sexton, as interim CEO, exceeded what the parties had discussed pre-signing as the "nuclear option"—*i.e.*, terminating C-level officers—and instead pushed the button to detonate an even more severe "nuclear option"—*i.e.*, terminating the Director-Designation Right.[363]  In doing so, Alphonso did not just fail to act to ensure Andrades and Sarma's continued enjoyment of rights under the Stockholders' Agreement.[364]   Instead, like the *Williams* Court's description of *Hexion*, Alphonso "actively and affirmatively torpedoed"[365] the Director-Designation Right, in unequivocal breach of its obligations under Section 12.1.

---

signatory to this Agreement pursuant to Subsection 13.9 and any one of them, as the context may require."), Exhibit A (identifying Zenith as the sole "Investor[]").

[362] *See* JX0050 § 13.1 ("Term and Termination.  (a) Term. This Agreement shall continue in force so long as [Alphonso] shall exist, unless terminated earlier pursuant to Subsection 13.l(b) (the 'Term').  (b) Termination.  This Agreement and all restrictions on the Transfer of Shares created hereby shall terminate on the occurrence of any of the following events: (i) The bankruptcy or dissolution of [Alphonso]; (ii) Any one Stockholder becomes the owner of all of the Shares which are then subject to this Agreement; or (iii) The execution of a written instrument by (x) [Alphonso], (y) LGE and (z) the Employee Key Holder Majority.  *For the avoidance of doubt, such execution by the Employee Key Holder Majority shall not be required if no Key Holder serves as an officer or employee of [Alphonso] at such time*.") (emphasis added).

[363] JX0023 at 4.

[364] I note that such a failure could be sufficient grounds on its own to constitute a breach of an affirmative obligation under an efforts clause. *Williams Companies, Inc.*, 159 A.3d at 273.

[365] *Id.* at 272.

And it did so at the behest of an interested counterparty to the Stockholders' Agreement—LGE, acting through Zenith.

To be clear, the Board had the right to terminate the executive-officer Key Holders.[366] And Chordia and Kodige certainly gave the Board many good reasons to do so. I have considered their conduct and the effect it should have on the Board's ability to terminate the executive-officer Key Holders. There is an extensive record of their unprofessional behavior, including a host of denigrating emails to LGE executives, blatant failure to observe the Board's exclusive authority to hire executive officers like Matta, use of the "LG" name, and conflicts involving the data privacy audit and stock option issues.[367] I need not recount those events here.

The Board had reason, and an express bargained-for contract right, to terminate the executive-officer Key Holders. But the Board also had no obligation to use reasonable efforts to ensure the Key Holders' enjoyment of the rights granted under the Stockholders' Agreement. Alphonso, on the other hand, had this exact obligation. And instead of even considering its obligations or any alternative paths forward, Sexton pulled the trigger.

The context surrounding Andrades and Sarma's employment is also relevant. When Andrades and Sarma first began working for Alphonso, they were at-will employees.[368]

---

[366] As the argument goes, the Board was not bound by the obligation in Section 12.1.

[367] *See supra* Section I.C.

[368] TT 388:12–389:9 (Andrades); TT 399:18–21 (Sarma).

But subsequent to the establishment of the at-will employment relationship, the parties entered into the Stockholders' Agreement.[369] Andrades and Sarma bargained for certain rights under that agreement—including the Director-Designation Right and Alphonso's promise to use reasonable efforts to ensure their rights are effective and that Andrades and Sarma are able to enjoy the benefits of the agreement.[370] Given that the rights were conditioned on employment, which was a condition within Alphonso's control, Alphonso committed itself to use reasonable efforts in that regard to ensure the rights were effective.

Part of considering whether an obligor had reasonable grounds to take the action it did, requires considering the alternative courses of action available to it and whether it attempted to resolve the issues. This is the second factor that courts look to when determining whether a party breached an obligation arising from an efforts clause.[371]

### 2. Active Attempts To Resolve

The second factor requires courts to consider "whether the party subject to the [efforts] clause . . . (ii) sought to address problems with its counterparty."[372]

Here, there were many less drastic alternatives to terminating the remaining Key Holders. After the Board had terminated the executive-officer Key Holders, the Employee

---

[369] JX0050.

[370] *See id.* §§ 10.2(b), 12.1.

[371] *See ConMed*, 2022 WL 2387802, at *35; *see also Snow Phipps Grp., LLC*, 2021 WL 1714202, at *42; *Akorn, Inc.*, 2018 WL 4719347, at *91.

[372] *ConMed*, 2022 WL 2387802, at *35; *Snow Phipps Grp., LLC*, 2021 WL 1714202, at *42 (Del. Ch. Apr. 30, 2021); *Akorn, Inc.*, 2018 WL 4719347, at *91.

Key Holder Majority consisted of the holder of the majority of Alphonso shares then held by Andrades and Sarma.[373] They alone held the entire right to designate all Common Directors.[374] This left Sexton and Alphonso with many different options—none of which were considered. For example, Sexton could have asked Andrades and Sarma to appoint new Common Directors. Sexton could have even explained LGE's perceived problems with Chordia and Kodige. Or, instead of firing them and depriving them of their rights, Sexton could have waited to see if Andrades and Sarma would designate different Common Directors once they could wield the right on their own and the prior Common Directors were no longer Alphonso employees. Sexton also could have negotiated with them or investigated any other alternative.

As noted previously, the credible evidence and trial testimony demonstrate that Andrades and Sarma were open to working with Alphonso and LGE. Both Andrades and Sarma were highly cooperative as individuals and as valued employees. Indeed, before Sareen withdrew his acceptance of the CEO role, he was adamant about keeping Sarma on his team after D-Day.[375] Hyoung-Saeyi Park similarly sought to bring Sarma back to Alphonso and discussed his return as a consultant.[376] Even after being terminated, both

---

[373] JX0050 §§ 10.2(b), 6.2.

[374] *See id.*

[375] *See* JX0455 at 1; TT 638:18–639:19 (Wasinger).

[376] TT 396:13–398:20 (Sarma).

Sarma and Andrades continued to help the teams they had worked with during their employment.[377]

Credible trial testimony also demonstrates that each participated extensively in the knowledge transfer process and were cooperative far in excess of what one might have anticipated given the circumstances under which they had just been terminated.[378] In fact, Alphonso only became aware of the need for a knowledge transfer process when Andrades—while still in his termination meeting with Sexton—voluntarily raised the question of how he should pass-off software modules and code that only he had worked on and understood.[379]

Terminating these remaining Key Holders to remove Chordia and Kodige from the Board without exploring any less drastic alternatives was a manifestly unreasonable course of action. In *Williams*, the high court noted that in *Hexion*, when concerns began to arise, "a reasonable response to such concerns might have been to approach [those toward whom efforts were owed] to discuss the issue and *potential resolutions of it*."[380] And that is how reasonable actors tend to do things. But here, there is not a shred of evidence demonstrating that Alphonso or Sexton gave any consideration to Andrades or Sarma's rights, much less interacted with them in any meaningful way prior to their terminations. On the contrary,

---

[377] *See* TT 396:13–398:20 (Sarma); TT 381:19–383:11 (Andrades).

[378] *See* TT 396:13–398:20 (Sarma); TT 381:19–383:11 (Andrades).

[379] TT 381:19–383:11 (Andrades).

[380] *Williams Companies, Inc.*, 159 A.3d at 272.

85

the record suggests that Sexton hardly knew who Andrades or Sarma were when he fired them. He only knew about them because LGE had tasked him with their terminations and only knew their roles at Alphonso because he had reviewed an organization chart in advance.[381] The evidence overwhelmingly supports the conclusion that Sexton terminated Andrades and Sarma at LGE's behest to terminate the Director-Designation Right.[382]

The Court's conclusion based on the facts and arguments at issue in *Williams* also compels a similar finding. There, the Court highlighted the trial court's recognition of evidence that an obligor:

> [D]id not direct [its law firm] to engage earlier or more fully with [the counterparty]'s counsel, failed itself to negotiate the issue directly with [the counterparty], failed to coordinate a response among the various players, went public with the information that [its counsel] had declined to issue the 721 Opinion, and generally did not act like an enthusiastic partner in pursuit of consummation of the [transaction].[383]

Based on this evidence, the Court found the trial court to have erred in analyzing whether the obligor had breached the obligations arising from the efforts clauses.[384]

Here too, the preponderance of evidence demonstrates numerous alternative and less drastic measures that Alphonso and/or Sexton could have attempted but gave no

---

[381] *See, e.g.*, JX0640 171:1–24, 179:1–23 (Sexton).

[382] TT 538:17–539:9 (Edward Lee).

[383] *Williams Companies, Inc.*, 159 A.3d at 273.

[384] *Id.*

86

consideration to. By beginning with the most drastic option, Defendants forewent any hope of addressing the issues in proportional and measured increments.

Furthermore, when reviewing the second factor, Delaware courts refer to "the party subject to the clause" as the one that must seek "to address problems with its counterparty."[385] But here, Defendants do not argue that Alphonso sought to address any issues with Andrades and/or Sarma. At best, Alphonso's LGE-controlled Board sought to address some of the issues with other Key Holders. There are two reasons why these "efforts" fail to satisfy the efforts clause. First, these actions were only taken with regard to persons to whom reasonable efforts were not owed (*i.e.*, Chordia and Kodige). Second, Defendants' own argument is that for the purpose of interpreting the obligations in the Stockholders' Agreement, the Board and Alphonso are distinct actors. But the reciprocal follows. That is, if Alphonso's obligations under the Stockholders' Agreement do not obligate the Board, then the acts taken by the Board should not be read as satisfying Alphonso's obligations under the Stockholders' Agreement.

In sum, I conclude that Alphonso did not have reasonable grounds to carry out its terminations of Andrades and Sarma in the way that it did, and Alphonso undeniably failed to take any steps or make any attempts to resolve the issues with Andrades and/or Sarma. Thus, Alphonso breached its obligation to use reasonable efforts and take all reasonable steps "to ensure that the rights granted under this Agreement are effective" and Andrades

---

[385] *ConMed*, 2022 WL 2387802, at \*35; *accord Akorn, Inc.*, 2018 WL 4719347, at \*91.

87

and Sarma "enjoy the benefits" of the rights provided in the Stockholders' Agreement. Accordingly, and as explained below, I find the Designation Condition excused and that Andrades and Sarma step into the shoes of Employee Key Holders under the Stockholders' Agreement.

* * *

Given the analysis above, I do not need to reach the implied covenant or *Schnell*. I acknowledge, however, the significant issues raised under those arguments and facts relevant thereto. For example, Plaintiffs proved by a preponderance of the evidence that Project Wall-E was undertaken for the purpose of eviscerating the Key Holders' liquidity rights and the limited protections they had negotiated of those rights. Plaintiffs proved that throughout LGE's planning for D-Day, its intention was to fire all Key Holders for the express purpose of terminating the Director-Designation Right and then terminating the Stockholders' Agreement altogether. Although the question of termination was disputed at trial, the evidence overwhelmingly demonstrates that it was only a question of "when" Zenith and LGE would terminate the Stockholders' Agreement and not "if" they would.[386] Having sat through the trial and assessed the credibility of each witness carefully, I conclude that at the time the LG-Affiliated Directors initiated D-Day, they had decided to terminate the Stockholders' Agreement sometime thereafter.[387] And, after having

---

[386] JX0505 at 1; *see also supra* n.207.

[387] *See supra* n.207.

determined to launch D-Day (*i.e.*, the "nuclear option"), LGE attempted to backfill justifications for many of its termination decisions.[388] The evidence demonstrates that many of those justifications were pretextual and, indeed, did not apply to several of the terminated executive-officer Key Holders. None of the reasons provided applied to Andrades or Sarma.[389]

These facts are certainly uncomfortable. But they are also insufficient to find a breach of the implied covenant, at least as it relates to the executive-officer Key Holders.

I have already found a breach of the Stockholders' Agreement's express terms as to Andrades and Sarma. Thus, I need not address the implied covenant as to them. For the sake of completeness, however, I briefly address the implied covenant arguments to the extent they concern the Board's terminations of the executive-officer Key Holders.

When applying the implied covenant, in its "gap filler" capacity, Delaware courts "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[390] Indeed "the implied covenant of good faith and fair dealing is recognized only where a contract is silent as to the issue in dispute."[391] In making this

---

[388] *See, e.g.*, JX0402 at 2 ("I believe the key decision we made today was who we will be terminating, and we need to back up our rationale for such termination." "Set our direction toward termination of all key share holders.").

[389] *See* JX0651 331:20–332:9 (Edward Lee).

[390] *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch. 2014) (citations omitted), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).

[391] *AQSR India Priv., Ltd. v. Bureau Veritas Hldg., Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009).

89

determination, courts must assess "whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[392]

Even "[w]here the contract is silent, '[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[393]  "[T]he implied covenant will not serve as a means to provide contractual protections that parties 'failed to secure for themselves at the bargaining table.'"[394]  It "only applies to developments that could not be anticipated, not developments that the parties simply failed to consider."[395]

In some instances, a contract may indeed be silent as to a term, but only because the parties negotiated over the matter and determined to reject the relevant term or otherwise not address the matter in the agreement.  "The most obvious reason a term would not appear in the parties' express agreement is that the parties simply rejected that term ex ante when

---

[392] *Allen*, 113 A.3d at 183.

[393] *Oxbow Carbon & Mins. Hldg., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 507 (Del. 2019).

[394] *S'holder Representative Serv. LLC v. Albertsons Companies, Inc.*, 2021 WL 2311455, at *8 (Del. Ch. June 7, 2021).

[395] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

they articulated their contractual rights and obligations."[396] This might arise where "the parties . . . considered the term, and perhaps [after] some give-and-take dickering, the parties agreed the term should not be made part of their agreement. They thus rejected the term by purposefully omitting the term."[397]

This is the case here, at least as to the executive-officer Key Holders. The parties bargaining history on this point is telling.[398] The bargaining history indicates that the parties considered employment contract terms and sought a CEO termination veto right.[399] And, after LGE rejected the CEO termination veto right, Beotra exchanged emails with Hahm. One such email explained Beotra's understanding that "LG controls the board and hence all the decisions that need simple board majority - CEO hire/fire/comp, operating plan, LG funding, additional debt etc."[400] Beotra reiterated this understanding in a subsequent email and expressly identified that LGE might seek to terminate the CEO for a variety of reasons. Beotra stated that LGE may seek to terminate C-level officers if there

---

[396] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *11 (Del. Ch. June 20, 2014).

[397] *Id.* (alteration and omission in original).

[398] *Nationwide Emerging Managers, LLC v. Northpointe Hldg., LLC*, 112 A.3d 878, 897–98 (Del. 2015) ("By necessity, any argument by a party that another party breached an implied term invites consideration of evidence of the parties' bargaining history.").

[399] *See* JX0012 at 2; JX0014 at 6; JX0020 at 41.

[400] JX0022.

91

is a "[f]alling out on strategy with key employees - In case of any disagreement with CEO/key employees LG has the right to prevail."[401]

This Court is "most chary" about implying terms in an agreement, and doubly-so when the concept was raised and discarded in the course of negotiations. It cannot be said that this is a circumstance in which no party contemplated the potential need for employment contracts or the possibility that the LG-dominated Board could terminate the executive-officer Key Holders to further LGE's interests in the absence of such contracts. Indeed, the record shows that this concept was specifically raised during the course of negotiations, including during the course of negotiations over the right of the LG-dominated Board to effectuate such terminations unilaterally. Having anticipated these points and having determined not to secure terms at the bargaining table to address them, the executive-officer Key Holders can find no refuge now in the implied covenant's gap-filling function.

"Beyond its gap filling function, the implied covenant applies 'when a party to the contract is given discretion to act as to a certain subject and it is argued that the discretion has been used in a way that is impliedly proscribed by the contract's express terms.'"[402] Here, contrary to being impliedly proscribed by the Stockholders' Agreement's express

---

[401] JX0023 at 1–3. Read in the context of the Beotra's ongoing conversation with Hahm, it is evident that the parties were referring to "C-level officers" and Beotra's references to the CEO were illustrative. *See id.* at 4.

[402] *SerVaas v. Ford Smart Mobility LLC*, 2021 WL 3779559, at \*10 (Del. Ch. Aug. 25, 2021) (quoting *Oxbow Carbon*, 202 A.3d at 504 n.93).

92

terms, the Board terminated the executive-officer Key Holders pursuant to an express contract term. "The Supreme Court has maintained that a contractual gap is not necessary to state a claim for breach of the implied warranty where one party acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain[.]"[403] But "[w]hen determining the parties' reasonable expectations, the court analyzes 'whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose.'"[404]

Here, again, the analysis is rerouted to the parties' understanding at the time of contracting. As the above analysis of the "gap-filling" function demonstrates, the Key Holders understood that the Board could unilaterally terminate the executive-officer Key Holders. Given this understanding, Plaintiffs fail to show by a preponderance of the evidence that the parties would have agreed to meaningful limitations on the Board's ability to terminate the executive-officer Key Holders.[405]

---

[403] *Haney v. Blackhawk Network Hldg., Inc.*, 2016 WL 769595, at *8 (Del. Ch. Feb. 26, 2016) (internal quotation marks omitted). Delaware courts interpret the "fruits of the bargain" language as based on the parties' reasonable expectations. *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1118 (Del. 2022) ("The party asserting the implied covenant has the burden of proving 'that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.'").

[404] *Baldwin*, 283 A.3d at 1118.

[405] The parties spilled significant ink on Plaintiffs' arguments concerning asserted limitations on termination of at-will employment. The Stockholders' Agreement, however, is a separate agreement and subject to implied covenant analysis under its unique terms and negotiating history. Even setting this aside, I note that Plaintiffs' arguments here focus largely on the asserted pretextual nature of Exhibit A (*i.e.*, the purported rationale for the executive-officer Key Holders' terminations). Unlike the cases Plaintiffs cite, this is not a

93

*Schnell* is also unavailing. Plaintiffs raise this argument "counterfactually" if there "were no breach of contract."[406] Given this, I note only that "our 'case law is indicative of a healthy inclination on the part of the judiciary to employ the *Schnell* principle of legal but inequitable' only sparingly[.]"[407] And indeed, "[a]lmost all of the post-*Schnell* decisions involved situations where boards of directors deliberately employed various legal strategies either to frustrate or completely disenfranchise a shareholder vote."[408] Defendants argue that the situations described in the foregoing sentence from *Coster* are very different from circumstances presented in this case. Having concluded that Alphonso breached the Stockholders' Agreement, I need not delve into this complex area of our law further in what would likely be dicta, at best, given the counterfactual posture in which Plaintiffs raise their argument.

---

circumstance in which an employer is claimed to have denied compensation by pretextually designating the at-will employee's termination as "for cause." *See* Plaintiffs' Post-Trial Opening Br. at 53 (citing *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575 (Del. Ch. May 29, 2020); *Smith v. Scott*, 2021 WL 1592463 (Del. Ch. Apr. 23, 2021)). Indeed, I question whether the Board needed to state a reason for terminating the executive Key Holders at all. The pretextual nature of much of Exhibit A unquestionably impairs my credibility assessment of the LGE witnesses, but I do not conclude that it triggers any of the very limited at-will employment termination exceptions identified in *Pressman*. *See Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000) (discussing *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436 (Del. 1996)).

[406] Plaintiffs' Post-Trial Opening Br. at 54.

[407] *In re WeWork Litig.*, 250 A.3d 976, 996 (Del. Ch. 2020).

[408] *Coster v. UIP Companies, Inc.*, 300 A.3d 656, 666–67 (Del. 2023) (quoting *Stroud v. Grace*, 606 A.2d 75, 91 (Del. 1992)).

### E. Remedy

Alphonso breached the reasonable efforts obligation in Section 12.1. This breach by non-performance excuses the Designation Condition. With the Designation Condition excused, the December Consent is rendered invalid.

#### 1. The Designation Condition Is Excused

When considering the appropriate remedy in circumstances of breach like this, "Delaware has adopted the framework set forth in the Restatement (Second) of Contracts."[409] The Restatement provides that "[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[410] This is sometimes referred to as the Prevention Doctrine.[411] But "the prevention doctrine 'only applies . . . where the lack of cooperation constitutes a breach . . . of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court.'"[412]

Plaintiffs have demonstrated by a preponderance of the evidence that the obligation imposed on Alphonso by Section 12.1 is the sort requiring some affirmative action and

---

[409] *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *90; *see also Williams Companies, Inc.*, 159 A.3d at 273 (citing Restatement (Second) of Contracts § 245 cmt. b (1981)).

[410] Restatement (Second) of Contracts § 245 (1981).

[411] *See Snow Phipps Grp., LLC*, 2021 WL 1714202, at *52.

[412] *Id.* at *53 n.576 (omissions in original) (quoting Restatement (Second) of Contracts § 245 cmt. a (1981)).

cooperation, the failure of which can give rise to a breach of contract. Plaintiffs also showed that Alphonso breached its contract obligation under Section 12.1. Specifically, Alphonso breached by failing to use reasonable efforts to ensure the effectiveness, and Andrades and Sarma's continued enjoyment of, the benefit of the Director-Designation Right. This is a breach by non-performance.

The question turns to whether the breach "materially contributed" to the non-occurrence of what Defendants serially characterize as a "condition precedent."[413] "A breach 'contributed materially' to the non-occurrence of a condition if the conduct made satisfaction of the condition less likely."[414]

Here, the condition required that at least one Key Holder remain an Alphonso officer or employee.[415] It is not disputed that Sexton, acting for Alphonso and thus owing Andrades and Sarma the obligation to use reasonable efforts, terminated them. In doing so, Sexton also terminated the Director-Designation Right.[416] At the very least, this made

---

[413] *See, e.g.*, Post-Trial Oral Argument Tr. 167:16, 169:23–170:5.

[414] *Snow Phipps Grp., LLC*, 2021 WL 1714202, at *52 (quoting *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *91).

[415] JX0050 § 10.2(b).

[416] To the extent it is relevant, I recognize the "one of his duties" language in the Restatement's articulation of the Prevention Doctrine. Here, Alphonso has an affirmative duty under Section 12.1 to use reasonable efforts to ensure that the rights granted in the Stockholders' Agreement are effective. This includes Andrades and Sarma's Director-Designation Right. And indeed, Defendants have expressly asserted that Section 12.1's second sentence relates to the Common Directors and rights related thereto. By implication, their argument required Alphonso to use its reasonable efforts to "ensure" the effectiveness of the Director-Designation Right. But the Director-Designation Right is

96

the satisfaction of the condition "less likely," but, practically speaking, it eliminated the right in its entirety. Although Sexton and Alphonso breached their obligations, neither has argued that Sexton's acts for Alphonso did not materially contribute to the non-occurrence of the condition.[417] And indeed, Sexton's acts were the foreseeable and the "but for" cause of the Designation Condition's non-occurrence. Deliberate acts to sink a ship, while not necessary, can be "sufficient to warrant application of the prevention doctrine."[418]

Here, it is probable that Sexton acted with the deliberate intention of "sinking the ship." But even if he did not, "the relevant question is limited to whether a party's breach 'contribute[d] materially to the non-occurrence of a condition.'"[419] Thus, it does not require "the court to analyze the subjective intent of the breaching party when conducting

---

conditioned on the non-occurrence of Andrades and Sarma's employment termination. It follows that the contractual duty to use reasonable efforts to ensure the Director-Designation Right is also conditioned on the non-occurrence of the employment terminations. Thus, by failing to use reasonable efforts, Alphonso materially contributed to the non-occurrence of the condition *on which one of its duties* is predicated.

[417] Once the breach has been shown, the burden shifts to the breaching party to show that the breach did not "materially contribute" to the failure or non-occurrence of the condition. Here, this is a burden that neither Alphonso nor Sexton have carried. *See Williams Companies, Inc.*, 159 A.3d at 273 ("[O]nce a breach of a covenant is established, the burden is on the breaching party to show that the breach did not materially contribute to the failure of the transaction.") (citing Restatement (Second) of Contracts § 245 cmt. b (1981)); *Snow Phipps Grp., LLC*, 2021 WL 1714202, at *52 (quoting *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *91).

[418] *Snow Phipps Grp., LLC*, 2021 WL 1714202, at *54.

[419] *Id.* at *53 (quoting Restatement (Second) of Contracts § 245 (1981)).

this inquiry. Nor have cases applying th[e prevention] doctrine required the court to undertake such an analysis."[420]

Defendants argued this issue at the post-trial hearing.[421] Contrary to the relevant standard, Defendants asserted that by terminating the Key Holders, "[i]t's not as though anything that defendants have done make that condition incapable of being satisfied."[422] Thus, "this isn't a circumstance which the prevention doctrine contemplates where satisfaction of a condition has been rendered impossible by the defendants' contract."[423] But as I have already noted, neither Delaware nor the Restatement look to whether a party's acts caused the impossibility of the condition. Instead, they look to whether the party's non-performance made the satisfaction of a condition "less likely."[424]

Here, Plaintiffs have satisfied this requirement and Defendants have not shown otherwise. These findings excuse the Designation Condition. Accordingly, I read the Director-Designation Right in Section 10.2(b) of the Stockholders' Agreement as no longer subject to the Designation Condition. As it would have been had Alphonso performed its Section 12.1 obligation, Andrades and Sarma step back into the shoes of Employee Key

---

[420] *Id.*

[421] Post-Trial Oral Argument Tr. 169:23–170:14.

[422] *Id.*

[423] *Id.*

[424] *Snow Phipps Grp., LLC*, 2021 WL 1714202, at \*52 (quoting *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at \*91).

Holders, and the Employee Key Holder Majority is thus the majority holder of Alphonso's Capital Stock held by Andrades and Sarma.

Although neither party has raised the issue, I acknowledge that there is an exception to the prevention doctrine where a party assumed the risk of prevention. That is, "'[t]here is no prevention claim where the contract, in effect, authorizes prevention' by allocating the risk of the condition's nonoccurrence."[425] This exception "generally applies in two situations. The first is when a contract 'uses explicit language to authorize prevention.' Courts have recognized explicit authorizing language including 'for any reasons whatsoever,' 'regardless of the circumstances giving rise to such condition,' or 'nothing [therein] requires' the agreed-upon condition precedent be consummated."[426] This application is not relevant here. "The second [application arises] 'when contract terms condition the consummation of a transaction upon the approval of the other party, or subject one party to the discretion, satisfaction, or decision of the other party or a third-party."[427]

Although this latter application might seem more apt for the present facts, it is also unavailing. As noted above,[428] the extent to which the Stockholders' Agreement can be read as conferring any right on Alphonso's CEO to terminate employees is tempered by

---

[425] *Murphy Marine Servs. of Delaware, Inc. v. GT USA Wilmington, LLC*, 2022 WL 4296495, at *13 (Del. Ch. Sept. 19, 2022) (footnote omitted).

[426] *Id.* (alteration in original) (footnotes omitted) (quotation marks omitted).

[427] *Id.*

[428] *Supra* Section II.C.3.

the requirement to use reasonable efforts to ensure the rights granted therein. In other words, the Stockholders' Agreement never gave the CEO unfettered discretion. It included an express limit on the exercise of the termination discretion to the extent such exercise could be seen to interfere with the other rights granted to the parties in the Stockholder Agreement. Accordingly, neither Andrades nor Sarma can be seen to have assumed the risk of prevention.

### 2. The December Consent Is Invalid

After Zenith believed the Key Holders to be properly terminated on December 16, 2022, it executed the December Consent.[429] The December Consent stated the following: "pursuant to Section 10.2(c) and Section 10.3(a)(ii) of the Stockholders' Agreement, Directors Ashish Chordia, Raghu Kodige, and Lampros Kalampoukas are removed from the Board."[430]

Section 10.2(c) provides: "Any vacant director seats not subject to designation in accordance with Subsection 10.2(a) or Subsection 10.2(b) above shall be appointed by the holders of Capital Stock entitled to vote in accordance with applicable law and the Restated Certificate."[431]

Section 10.3(a)(ii) provides:

Each director shall serve until his or her successor is elected and qualified or until his or her earlier resignation or removal. Each Stockholder also agrees

---

[429] *See* JX0563.

[430] *Id.* at 2.

[431] JX0050.

to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that: (a) no director elected pursuant to Subsection 10.2(a) or (b) of this Agreement may be removed from office unless . . . (ii) *the Person(s) originally entitled to designate or approve such director or occupy such Board seat pursuant to Subsection 10.2(a) or (b) is no longer so entitled to designate or approve such director*[.][432]

The validity of the December Consent thus depends on those entitled to appoint the Common Directors under Section 10.2(b), being "no longer so entitled to designate or approve such director[.]"[433]  Since I have found that the Designation Condition was excused and Andrades and Sarma stepped into the shoes of acting Employee Key Holders, it follows that the requirements of Section 10.3(a)(ii) were not satisfied and the December Consent must be deemed invalid.

I recognize the impracticality of returning Chordia, Kodige, and Kalampoukas to the Board since their terms have already expired.[434]  But the Director-Designation Right is a *continuing* right under the Stockholders' Agreement.  Accordingly, I find it appropriate for the majority holder of Alphonso's Capital Stock presently held by Andrades and Sarma to select the directors to fill the seats properly allocable to the Common Directors.

Defendants have argued that it would be improper to return certain Key Holders to the Board since they now work for a competitor.  But even if this were true, it is not clear

---

[432] *Id.* (emphasis added).

[433] JX0050 § 10.3(a)(ii).

[434] Indeed, the parties debated at significant length the question of appropriate and practical remedies in the event of a finding of breach.

why this requires precluding their membership on the Board, should Andrades and Sarma so choose. Our high court has explained that there is "'no dilution' of the duty of loyalty when a director 'holds dual or multiple' fiduciary obligations."[435] If they were to act inconsistent with their fiduciary duties, they would expose themselves to fairly obvious civil liability consequences.

That being said, I strongly encourage Andrades and Sarma to give consideration to whom they will select as Common Directors—taking into account the events described herein.

## III. CONCLUSION

The foregoing compels judgment in Plaintiffs' favor. Andrades and Sarma step into the shoes of Employee Key Holders under the Stockholders' Agreement, the Director-Designation Right remains operative, and the Designation Condition is excused. The parties are directed to confer on a form of implementing order that includes a process for Andrades and Sarma to designate Common Directors and to file such proposed form of order within three business days.

---

[435] *See Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *28 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 24, 2017). ("'If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict.' But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest. 'There is no 'safe harbor' for such divided loyalties in Delaware.'") (citations omitted).